## GULF STATES UTILITIES CO. v. MOORE.
### No. 2455.

Court of Civil Appeals of Texas. Beaumont.
March 9, 1934.

Rehearing Denied July 16, 1934.

942

Orgain, Carroll & Bell, of Beaumont, for appellant.

Renfro & Keen, of Beaumont, for appellee.

COMBS, Justice.

Henry T. Moore was killed as a result of coming in contact with an electrically charged

telephone wire while in the employ of the appellant near Liberty, Tex., on May 22, 1930. The appellant, a private corporation, did not carry workmen's compensation insurance on its employees, although it was eligible to carry such insurance, and this suit was filed in the Fifty-Eighth district court of Jefferson county by Mrs. Edith Moore, surviving wife of Henry T. Moore, as a common-law action to recover damages in the sum of $75,000, plus an additional $2,000 alleged to have been spent for hospital, medical, and burial expenses.

A trial to a jury on special issues resulted in findings convicting the appellant of negligence in several respects proximately causing the death of the deceased, and judgment was entered thereon in favor of appellee for $40,-611;. the jury having fixed appellee's damages on the general issue at $40,000 and found on another issue that $611 was expended by her for funeral expenses and hospital bill. This is the second appeal of this case. Gulf States Utilities Co. v. Moore (Tex. Civ. App.) 47 S.W.(2d) 488.

No point is made as to the sufficiency of the pleadings to support the issues submitted, and it is unnecessary for us to summarize the pleadings. The evidence is unusually free of conflict. The facts so far as material to the issues involved are substantially as follows:

The deceased, Henry T. Moore, on the occasion of the accident, was one of a crew of twelve men employed by the defendant working on a high line. At the time of the accident the crew, including the deceased, was engaged in constructing and putting braces and guy wires on an "H" formation pole, the formation consisting of two poles some 75 feet in height set a few feet apart, with cross-arms connecting them and extending out on either side for a short distance. These cross-arms, which were near the top of the poles, carried a number of high-voltage electric transmission lines; beneath them and about 35 to 37 feet from the ground was a shorter cross-arm on one of the poles, carrying the telephone wire which caused the death of the deceased.

The work on this formation, it seems, required several days, as the crew had been working on it some three or four days at the time of the accident. In working on the cross-arms it was necessary for the linemen, including the deceased, to climb up the poles by the aid of climbing tools or spurs, to the cross-arms near the top. For the purpose of sending up supplies needed in the work from

time to time a supply line, consisting of a one-half inch rope, which operated by means of a pulley attached to one of the outer ends of the cross-arm, was strung up from the ground and by means of it a workman on the ground drew the supplies up to the workmen. This supply line was outside of the pole on which the telephone line was strung, and near enough to the telephone line that articles being drawn up could swing over and strike against it.

In reaching and descending from his work on the cross-arms it was necessary for the deceased and other linemen to climb up and down the pole which carried the telephone line and just outside of which the supply line was operated. When work began on the "H" formation the telephone wire was strung on the outside of the formation. This telephone line carried something like 750 volts of electricity, or, to use the words of the witnesses, it was "hot." Members of the crew, including the deceased, and the foreman, McMillan, knew this. So, at the beginning of the work, McMillan directed that rubber insulators, or rubber "guts," as they are referred to in the record, be placed on the telephone line to prevent the workmen coming in contact with it. These rubber insulators were two in number, each three or four feet in length and were on the order of a piece of garden hose split open and placed over the wire "hot dog fashion." The two pieces were pushed together at the cross-arm and extended either way from the place where the wire was fastened to its support. These insulators were put on by Joe Prejean, one of the linemen.

As above mentioned, when the work began and when the rubber insulators were put on, the telephone wire was on the outside of the "H" formation, but after the work began and a day or two before the accident the deceased and Oscar Farquhar, another lineman, by direction of McMillan, the foreman, cut the telephone line and brought it inside of the "H" formation and tied it back together. This was to get it out of the way of the linemen who, it seems, climbed up and down the outside of the pole in reaching and descending from the place of work on the cross-arms above. In cutting the wire and putting it inside the formation, deceased and Farquhar handled it "hot," using rubber gloves. The insulators were left in place. After being placed inside of the formation the telephone wire was 6 to 8 inches from the inside of the pole and the outside of the pole was left clear for the workmen to climb up and down. This they did by means of the climbing tools, their hands being extended around the pole. Such

was the general situation at the time of the accident complained of.

On the occasion in question, while descending from his work at quitting time, Moore's right hand came in contact with the charged telephone wire and he was killed.

The death of Moore and the events immediately preceding it are thus described by plaintiff's witness, Ted Fisher, one of the members of the crew: We shall, for the sake of brevity, summarize his evidence on these matters. Fisher had been working with the crew some four or five months and was a helper. It seems that his work did not require him to climb up the poles. He stayed on the ground and was the member of the crew who handled the supply line and drew the material up to the linemen who worked on the cross-arms. At about 5:30 in the afternoon the foreman, Mr. McMillan, hollered, "Time out." Quitting time was 6 o'clock and it would take the workmen about 20 to 30 minutes to get back to the plant, out of which they were working. At the time the foreman thus announced it was time to quit for the day, four linemen, including the deceased, were at work on the cross-arms near the top of the "H" formation. Three of the linemen came down ahead of Moore, who was the last to start down. No witness seems to have seen Moore at the moment he came in contact with the wire. Fisher narrates the events from this point on as follows:

"Naturally when one starts the others will come until they get to the ground. Moore was the last. When the two first ones hit the ground they pulled off their tools and throwed them in the truck and we had a special box for tools.

"Q. Now that was their climbing tools you have reference to? A. Yes sir. Then Cooper, the next to the last one down, had his tools on and talking to Ed McMillan, the foreman, with the other fellows; we done had everything on the truck ready to go when he came down. I looked up and seen him (Moore) coming, that is he had started down the pole —and so he hadn't much more than time to take a few steps when I heard him holler and looked up and he was frozen to the pole. One hand to the pole and one to the wire. * * * The foreman gave instructions to get him off. Cooper was the only man had on tools so he went up. The other fellows tried to get on their tools but they had them all mixed up. He (Cooper) tried to knock his (Moore's) hook off and couldn't and he reached around and got his (Moore's) safety belt and pulled him loose; he fell anywhere from 34 to 37 feet.

"Q. He was sticking to the wire and the pole when he pulled him loose by the safety belt. A. Yes sir; you could see smoke."

When Cooper succeeded in knocking Moore loose, he fell to the ground. The witness and McMillan, the foreman, undertook to break his fall, but in falling Moore's body struck a service line some 12 or 15 feet from the ground, which deflected him out of reach and he fell on the ground. Moore died instantly, it not being shown whether the electric shock or the fall produced his death.

When Moore was discovered "frozen" to the pole and wire, he was holding to the pole with his left hand and his right hand was grasping the bare telephone wire about even with or behind the pole, and his face was against the pole which, at that point, was about 12 inches in diameter. Smoke was issuing from the hand which held the wire, and it is shown that the hand was severely seared, leaving pieces of flesh clinging to the wire at the point where he had grasped it.

As above stated, no one saw the deceased at the time he came in contact with the wire, but when discovered the ends of the insulators had become separated in some manner, leaving the wire exposed at the point behind the pole where he had hold of it. It is shown that these insulators had an inside diameter of about three-fourths of an inch, much larger than the wire, which was no larger than a pencil, if that large. Thus the insulators could easily slip along the wire. It is also shown that the wires sloped downward or sagged in either direction from the point on the support where the two ends of the insulators had been pushed together. The two pieces of insulation were not taped or fastened together in any way. The foreman, McMillan, testified that he did not instruct the workmen who placed the insulator on as to the details of how they were to do it. He did not instruct them to tie or tape the two pieces together. He knew that they were not tied or taped together, and he testified that had they been tied or taped together they would not have become separated, exposing the wire. It is also shown that another form of insulator, a rubber hood, could have been placed over the wire which would have afforded protection against contact with it. No rubber hood was placed on this wire. McMillan supervised the work from the ground and could see the insulators and the wire. He was in full charge and direction of the work. He had not noticed prior to the time of the accident that the two insulators had become separated. Neither had any other member of the crew so far as is shown.

In response to issues submitted, the jury convicted appellant of negligence proximately causing the death of the deceased in the following respects: (a) In failing to tie or make fast the insulators or rubber "guts"; (b) in failing to furnish the deceased a reasonably safe place to reach and leave the place on the "H" formation where he was working; (c) in failing to insulate the telephone wire with which he came in contact; (d) in failing to have as a part of its equipment a blanket or net to be used in catching a falling man who had become entangled in a charged electric wire; (e) in failing to keep a proper lookout to determine if the insulation on the telephone wire at the point in question had slipped or shifted out of place; (f) in failing to properly operate the guy lines on the formation so as to avoid their striking against the insulators, thus displacing them; (g) in failing to exercise ordinary care in the operation of the supply line; (h) in allowing an exposed charged telephone wire to remain in the line of travel of the deceased; (i) in failing to make inspection of the telephone wire to determine if it was properly insulated so as to be reasonably safe for the men working on the formation; (j) in failing to furnish deceased with a reasonably safe place to work. The jury also found that the injury complained of was not the result of an unavoidable accident.

In response to a general issue the jury fixed plaintiff's damages at $40,000, and in response to another issue found that plaintiff had expended $611 for hospital and burial expenses.

Appellant pleaded numerous acts of contributory negligence, and upon its excepting to the court's charge for failure to submit them to the jury, the court submitted these matters of contributory negligence, in response to which the jury found that the deceased, Henry T. Moore, *did not fail* to arrange a reasonably safe passage to leave and reach the place on the "H" formation; that the deceased *did not fail* to insulate the wire in question; that he *did not fail* to make fast the insulation in question; that he *did not omit* to make the place of work reasonably safe; and that he *did not omit* to keep a proper lookout to ascertain the condition of the wire.

By its propositions 1, 2, and 3 the appellant complains of the refusal of the trial court to grant its motion for instructed verdict, contending that the evidence as a whole did not raise any issue that it was guilty of any negligence proximately causing the death of the deceased. These propositions are overruled. It is true, as contended by appellant, that the evidence does not show specifically how the rubber insulators became separated. No one had discovered that they were separated until the accident occurred. But there is no doubt that they had become separated in some manner, leaving the wire exposed at the point where the deceased's hand came in contact with it. The witness Fisher, who operated the supply line from the ground, testified that in drawing up supplies they would strike against these insulators, and he testified, without objection, that he supposed it was this striking against the insulators which caused them to slip apart. The manner in which they were loosely placed on the wire and the sloping of the wire in either direction from where they came together would naturally make it easy for them to slip apart. The foreman, McMillan, testified that he was in full charge of the work; that he directed the putting of the rubber insulators on the line for the protection of the men. He further testified:

"Q. You were the foreman on that job? A. Yes, sir.

"Q. I believe you testified that. Did you have full authority? A. Well, I had full authority of the gang, yes, sir.

"Q. Well, that's what I mean, of the gang. If you told a man to cut a line, it was his duty to cut the line. Is that right? A. Correct.

"Q. If you told him to climb a pole, it was his duty to climb? A. Yes, sir.

"Q. If he was up on the formation, working, and you ordered him down, it was his duty to come down? A. Right.

"Q. If you ordered him to put rubber gut on a line, it was his duty to do so? A. It was his duty to cover it for his own safety, you see.

"Q. You say it is his duty? I thought you were foreman? A. I was foreman, yes sir.

"Q. If you instruct him to put an insulator hood on instead of a rubber gut, he is required to put an insulator hood on instead of a rubber gut, isn't he? A. Yes, sir, he sure is.

"Q. If you tell him to put a rubber gut on, it is his duty to put it on? A. Yes, sir.

"Q. And it must be all under your instructions and according to your instruction, is that right? A. Well, it is, one way it is right and then the other way—

"Q. If he doesn't put it on according to your instructions do you have authority to have it changed? A. Yes, sir.

"Q. You have authority? A. Yes, sir.

"Q. Then the work is done according to your instructions and you have a map to give you instructions on formation work, and you have full authority to instruct the men on the work, what to do and what not to do; is that right? A. Correct.

"Q. Were those rubber guts put on there according to your instructions? A. Yes, sir; they was put on there at the time they was put on there by my instructions."

Joe Prejean, who put the rubber insulators on the wire, a witness for appellant, after stating that McMillan was in charge of the work, testified:

"Q. Suppose he (McMillan) says put a rubber gut on it, could you put an insulator on it and a hood and not put the gut on or do you have to do as he says? A. I have to go as he orders.

"Q. His instructions are final? A. Yes sir.

"Q. You covered it according to his instructions? A. Yes sir."

█ The facts, which are without dispute, clearly raised the issue that appellant's foreman, McMillan, was negligent in failing to see that the insulators were made fast, or in directing that a rubber hood or other sufficient protector be placed over the wire. He knew the wire was dangerous and had so warned the crew. He knew that the linemen, including the deceased, must climb up and down the pole in order to reach and leave their work; that it was only 6 or 8 inches from the inside of the pole, to which they must hold in climbing or descending; and that their hands must necessarily come in close proximity to it, and that it might and probably would be touched by their hands. The point where the insulators came together and where, because of the sloping of the wire in either direction, they would naturally separate and expose the wire in case they should slip apart was behind the pole; which at that point was some 12 inches in diameter, which would tend to prevent the linemen from seeing the exposed wire. It was admittedly his duty to supervise the work and to direct and oversee the doing of it in a proper manner, and this certainly included the duty of seeing that proper safety appliances were used for the protection of the workmen in this high line work, which was in its very nature highly dangerous. He testified also that while it was their duty to exercise proper care for their own safety, he expected the workmen to depend upon the safety measures taken. Yet it appears without controversy that he took no steps to render the wire safe except to direct the placing of the loosely fitting insulators or "guts" over it and to warn the crew that the wire was "hot." We think the facts amply sufficient to warrant the jury in concluding that a reasonably prudent man, under these circumstances, would have foreseen that these insulators might become separated and injury to the workmen result, and that he would have had them taped or fastened together or have used a rubber hood, either of which measures, according to McMillan's undisputed testimony, would have prevented the accident. If the jury so believed, and if they further believed that the failure of the foreman to see that these safety measures were adopted was the proximate cause of the death of Moore as the evidence would amply warrant them in believing, then their answers on the issues of appellant's negligence were proper. We think the evidence is ample to sustain the jury's findings.

What we have said above disposes of appellant's further contention that the evidence, at most, showed only that the death of the deceased was as reasonably attributable to a nonactionable cause as to an actionable cause and that, therefore, its liability cannot be predicated upon a mere guess. Appellant cites Gulf, C. & S. F. v. Davis (Tex. Civ. App.) 161 S. W. 932; Davis v. Castile (Tex. Com. App.) 257 S. W. 870 and Texas & P. Coal Co. v. Kowsikowski, 103 Tex. 173, 125 S. W. 3. The cases are not in point. In the cases cited no facts were shown from which a reasonable inference of the negligence of the defendant could be drawn. In the case before us the happening and all of the circumstances surrounding it are clearly shown, except that it is not shown in what specific manner the insulators became separated. And, further, the facts exclude any theory that the deceased himself deliberately separated the insulators or had stopped to inspect them and was thus tampering with them. He, with the other men, was quitting for the day and was simply coming down the pole. Only a few seconds elapsed from the time Fisher saw him coming down the pole until the workmen heard him holler and discovered him "frozen" to the wire. He did not have his safety belt buckled around the pole, as it is shown he would have had to have if he had stopped to work. The fact that deceased was an experienced electric lineman and knew the wire was dangerous, having previously handled it with rubber gloves, excludes any idea that he intentionally put his unprotected hand on the bare wire. The facts are perfectly consistent with the theory that his hand accidentally came in contact

with it as he moved his hands down the back of the pole in coming down.

By its fourth proposition appellant contends it was entitled to judgment on the jury's findings that the deceased *did not fail* to insulate the wire in question; that he *did not fail* to arrange a reasonably safe place to reach and leave the "H" formation; that he *did not fail* to tie and make fast the insulation, etc. Its contention under this proposition seems to be that the jury's findings to the effect that the deceased did not fail in the matters inquired about amount to findings that he did them and, therefore, the acts and omissions charged as negligence of the appellant did not occur. And by its fifth proposition appellant contends that if such findings did not entitle it to judgment then they are, at any rate, in direct conflict with those findings wherein the jury convicted appellant of negligence in regard to those matters; in other words, that the jury found that deceased did not fail amounts to a finding that the negligent omissions charged against the appellant did not occur and hence contradict the previous findings of the jury that the appellant was negligent in these respects. The jury's answers to the issues could not have had the effect contended for by appellant for two reasons:

First, under the pleadings and the proof, the jury's findings that the deceased did not fail or omit to do the things inquired about did not amount to findings that deceased did them or that appellant did not fail or omit to do them; and,

Second, since these issues related only to appellant's plea of contributory negligence, a defense which, as a matter of law, was not available to it, the jury's answers to them are wholly immaterial.

The deceased owed no duty to the appellant to see that safety appliances were provided or that the wire was properly insulated. The undisputed proof is that these duties devolved upon McMillan, the foreman. As used in the issues submitted, the words "to fail" or "to omit" imply an obligation to perform and carry with them the implication of neglect of duty. Before there could be negligence or want of due care, there must exist a duty or obligation which has been undischarged or unfulfilled. The defendant in its pleadings had charged the deceased with contributory negligence in these respects and had alleged that his omissions of duty were the proximate cause of his death. The plaintiff, in her petition, had charged the defendant with these identical negligent failures and omissions on its part as the basis of her cause of action. It was not disputed that they occurred. And since the evidence shows that the primary duty of seeing to the safety measures was owed by defendant's foreman, McMillan, and not by the deceased, the jury may properly have concluded that deceased was not guilty of the failures and omissions inquired about but that the defendant was. Thus, in view of the pleadings and evidence, there is no conflict in the findings of the jury.

Moreover, as already suggested, these issues concerning the omissions of the deceased related and could only relate to the plea of contributory negligence of the deceased. Since the appellant was eligible to subscribe for workmen's compensation insurance and was not a carrier of such insurance, the defense of contributory negligence, assumed risk, and negligence of a fellow employee were not available to it. Article 8306, R. S. 1925, as amended (Vernon's Ann. Civ. St. a.t. 8306); Malley v. Union Indemnity Co. (Tex. Com. App.) 12 S.W.(2d) 1002; Scottino v. Ledbetter (Tex. Civ. App.) 56 S.W.(2d) 282. The issues should not have been given, as no answer which the jury might have made thereto could constitute any defense. El Paso Electric Co. v. Sawyer (Tex. Com. App.) 298 S. W. 267; Great West Mill & Elevator Co. v. Hess (Tex. Civ. App.) 281 S. W. 234. The jury's answers to these issues are, therefore, wholly immaterial.

By its sixth proposition the plaintiff complains of the court's charge on burden of proof. The court, in the introductory part of the charge, simply instructed the jury in the usual form to be governed by a preponderance of the evidence in answering the issues, and defined the term. The issues themselves, with the exception of the issue of unavoidable accident, were not so framed as to cast the burden of proof on either party. The issue of unavoidable accident was so framed as to place the burden of proof on plaintiff. Appellant contends that the court's charge placed an undue burden upon it, since it was entitled to have the issues as to its negligence so framed as to require them to be answered in its favor if there was no preponderance of the evidence against it. Appellant cites Psimenos v. Huntley (Tex. Civ. App.) 47 S.W.(2d) 622; Chicago, R. I. & G. R. Co. v. Vinson (Tex. Civ. App.) 61 S.W. (2d) 532; and Eagle Star & British Dominions Ins. Co. of London, England, v. Head (Tex. Civ. App.) 47 S.W.(2d) 625, in support of this proposition.

Regardless of whether the rule announced in the cited cases is sound, those cases are obviously not in point on the facts. In the case before us the facts, unlike those in the cited cases, are absolutely without dispute. Here the witnesses do not differ in any material respect as to what took place. Neither party, as we construe the record, contends that there is any material conflict in the facts. The differences between the contentions of appellant and appellee in this regard pertain to the deductions to be drawn from the facts. Appellant contends here, as it did in the trial court, that the matters complained of, under the facts shown, constitute no actionable negligence on its part, but if negligent, then such negligent acts and omissions were not the proximate cause of the death of Henry T. Moore.

■ It is a well-recognized principle that a charge on burden of proof is not necessary or proper in every case but its propriety depends upon the state of the evidence. St. Louis Southwestern R. Co. v. Preston (Tex. Com. App.) 228 S. W. 928; 24 Tex. Jur. 612; Texas & N. O. R. Co. v. Syfan (Tex. Civ. App.) 43 S. W. 551, 554. In fact, it is well established by recent decisions that where a case is submitted on special issues it is error to charge on burden of proof. Here, the trial court gave no general charge on "burden of proof" but did charge the jury generally to answer the issues from a "preponderance of the evidence." We do not think this was reversible error. Texas Employers' Ins. Ass'n v. Galloway (Tex. Civ. App.) 40 S.W.(2d) 973. If error, it was harmless. There was no conflicting evidence to be "weighed" by the jury, and no contradictory witnesses whose credibility it was necessary for them to "judge" in ascertaining the facts forming the basis of their answer to any issue submitted.

■■ The rule requiring the jury to be governed by a preponderance of the evidence in arriving at their answers to issues has application only to their ascertainment of the *facts* and not to the deductions which they, as jurors, are called upon to make from the facts. The latter call simply for their opinion and conclusion, based upon their knowledge and experience as members of society. Thus upon an issue of negligence it is for the jury to determine from a preponderance of the evidence what the circumstances surrounding the occurrence complained of were, and having thus determined the circumstances, it is for them to say whether the act was negligent, basing their deductions from the facts upon their knowledge and experience as to

how that mythical person "the man of ordinary prudence" would have acted under these or similar circumstances. Here, the facts being established without dispute, it was only necessary for the jury to make their deductions from them. Hence the failure of the court to so frame the issues as to cast the burden of proof on appellee as to the issues of appellant's negligence did not and could not have affected the jury's answers thereto.

■ Appellant complains of that portion of the court's charge relating to "new and independent cause," which reads as follows: "A new and independent cause is an intervening efficient force which breaks the causal connections between the original wrong and the injury. Such new force must be sufficient of itself to stand as the cause of the injury and be one but for which the injury would not have occurred. The term 'New' refers to and means a cause incapable of being reasonably foreseen by the original wrongdoer by the use of ordinary care on his part, and the word independent refers to and means the absence of the relation of cause and effect between the new cause and the original wrongful act or omission and unless the intervening cause is thus both new and independent, sufficient of itself to stand as the cause of the injury breaking the causal connection, the original wrongdoer is not relieved from legal responsibility for his wrong or negligence."

The objections urged are: First, that it is a general charge; and, second, that, as framed, it was calculated to cause the jury to be impressed with the effect of their answers to the issues relating to proximate cause.

We do not think the charge subject to the objections urged. It did not purport to be, and was not, a general charge upon the law of the case, but was an explanation and definition of the legal term "new and independent cause," as used in the definition of "proximate cause." It was proper for the court to define the term. Robertson & Mueller v. Holden (Tex. Com. App.) 1 S.W.(2d) 570. Nor was the charge prejudicial to appellant wherein the jury were told that "unless the intervening cause was both new and independent * * * the original wrongdoer is not relieved from legal responsibility for his wrong or negligence." On the former appeal this court referred with approval to the holding announced by the late Chief Justice Hightower of this court in Linn Motor Co. v. Wilson (Tex. Civ. App.) 14 S.W.(2d) 867, wherein it was held that a definition of "new and independent cause" should be included in the definition of "proximate cause."

See Gulf States Utilities Co. v. Moore (Tex. Civ. App.) 47 S.W.(2d) 488. The exact charge here complained of was before this court in Stedman Fruit Co. v. Smith, 28 S.W.(2d) 622, and was held to be good against the general objections there urged against it. The objections urged here are no more specific than in that case, except in urging that it informs the jury of the effect of their answers. We do not think it subject to that objection.

Appellant insists that the verdict is so clearly excessive as to show that some undue passion, prejudice, or improper motive entered into the deliberation of the jury in arriving at it. This assignment is overruled.

Deceased was twenty-nine years of age at the time of his death and had a life expectancy of thirty-six years. The appellee, his widow, was twenty-six years of age and had a life expectancy of thirty-eight years. Deceased was regularly employed and earning $7.50 per day as an expert lineman. His widow testified that at the time she married him in 1922 he was earning about $100 per month; that he applied himself closely to his work, studied the technical features of it, and had been steadily advancing. It is shown that he had been employed for two years in the state of New York at $150 per month before he began work for the appellant, some five months before his death. Mrs. Moore testified that the deceased was sober, industrious, and a hard worker, and that he furnished her with necessities and comforts of life in keeping with his means, and that she is not trained for any special kind of work. There is nothing in the record to indicate that the jury were influenced in any manner by passion or prejudice or any improper motive.

Ordinarily the amount of damages to which a party is entitled is primarily and peculiarly within the province of the jury. Galveston, H. & S. A. R. Co. v. LeGierse, 51 Tex. 189. In the absence of a showing of passion, prejudice, or improper motive, the jury's verdict fixing the amount of damages will not be set aside as excessive either by the trial court or the court on appeal. 13 Tex. Jur. 262; McCormick v. Missouri, K. & T. Ry. Co., 25 Tex. Civ. App. 321, 61 S. W. 983. While the award is a large one, the evidence which we have briefly summarized fully supports it. Beaumont, S. L. & W. R. Co. v. Sterling (Tex. Civ. App.) 260 S. W. 320; Texas & N. O. R. Co. v. Harrington (Tex. Civ. App.) 241 S. W. 250; Hines v. Mills (Tex. Civ. App.) 218 S. W. 777.

Appellant contends that the judgment of the court allows a double recovery. In response to a general issue the jury fixed plaintiff's damage at $40,000 and also found in response to another issue that she had expended $611 burial expenses and hospital bills. In entering judgment the court added the two items together. This was error. The general issue, as submitted by the court, clearly comprehended all elements of damage which it was proper for the jury to consider, including sums expended as a result of the injury. It was, therefore, improper for the court to allow the item of $611.

The judgment will be reformed so as to eliminate this item, and as so reformed the judgment of the trial court will be affirmed.