**MALLEY et al. v. UNION INDEMNITY CO.**
**(No. 1156–5122.)**

Commission of Appeals of Texas, Section A.
Jan. 23, 1929.

Johnson & McConnell, of Houston, for plaintiffs in error.

Vinson, Elkins, Sweeton & Weems, and C. M. Hightower and E. D. Adams, all of Houston, for defendant in error.

### Statement of the Case.

NICKELS, J. Holcomb (employer) was engaged "in * * * filling back of a wall" which extended "between 1,500 and 1,800 feet" along the "water front." "Dirt" excavated from "cuts" in the vicinity was used in the "fill," and, at various periods, water would be pumped on the "dirt" so as to "settle" it "down." The "premises" throughout length of the "fill" was several hundred feet wide. Generally, the work was prosecuted during "daytime" and "nighttime." Holcomb would be present part of the time; and, when present, he had immediate charge and direction of all work and employees; in his absence Blair (at times) and Weeden (at other times) represented him in direction of work and employés.

The "premises" included machinery, etc., as follows: (a) A pump operated by a "gasoline engine" used in the "settling" process. (b) A "drag line" used in excavating, etc. (c) A "portable toolhouse." These things were so located as to be several hundred feet each from the others; the "pump" being about half-way between "drag line" and "toolhouse."

The "toolhouse" consisted of one "room" built upon a truck frame. Its floor surface was about two feet above ground surface; its walls (inside measurement) were about five feet in height, the side walls being from "twelve to fifteen feet long" and the "room" being "about eight" feet wide. In each side wall there was a door space about two and one-half feet wide and extending from floor surface almost to roof. These openings were directly opposite, and the side of each (nearest the front) was about three feet from the end of the "house." One-piece shutters were provided for each opening—so hinged as to open outward and backward against the wall. The "front" end of the building was completely closed. There was no wall at the rear end, but two shutters (of equal dimensions) were provided—so hinged as to open outward. "Wires" were attached to the walls so as to hold the shutters when the "doors were open." Except when the "house" was being moved from "job to job," etc., and (possibly) except in heavy rains, the door shutters were supposed to be kept "wired back"; they were in fact so "opened" and fastened at the latest period of knowledge of conditions; i. e., about 8:30 o'clock p. m., May 14, 1926, prior to Malley's death.

Within the "room" of the "toolhouse," and immediately between the side door openings, there was a "gasoline engine," batteries and wires used as equipment for lighting the "premises." Lighting equipment was so arranged as that current would be available for lighting for a period after the "gasoline engine" would be "stopped." Apparatus for "starting" and "stopping" the engine and for "turning on" or "turning off" light current was so arranged at the side-door spaces as that a person (from the outside) could manipulate it. Receptacle from which the engine was supplied with gasoline was situated within the "room," but so arranged as that a person could fill it without entering the room; i. e., "by leaning over the machine," and he

"wouldn't be comfortable doing it that way," although it "was supposed to be put in from the outside." "To oil that engine," Weeden said, "we kept oil in a can in or near the toolhouse somewhere."

Weeden once said that "oil, etc., for the drag line were kept in the toolhouse where they could be locked up." In another connection he said: "To carry out instructions he did not have to go in that toolhouse to get oil because we kept the alemite" (i. e. oil for the "drag line," etc.) "on the machine."

Within the room, along the left-hand wall (looking forward), and about two feet above the floor surface, there was a bench or shelf about fifteen inches wide.

The room (including the shelf) was used for storage of tools, "parts," "oil cans," "cables," etc.

Malley (employee) was 25 years of age, weighed 167 pounds, was five feet eight inches "tall," and was in good health. "He was smart and * * * knew something about gasoline engines."

That the "gasoline engine" as operated likely would, and in fact did, generate or release "carbon monoxide gas" within the "room," that such "gas" was deadly, and was, in fact, the immediate cause of Malley's death, is not questioned or, on the record, questionable. Dr. Kenner (qualified as an expert) said: "When one inhales carbon monoxide gas there is no pain at the time"; "the inhalation of carbon monoxide gas is something like any other anæsthetic administered"; "it would take at least twenty minutes before he would begin to feel anything and it would take about an hour with slight ventilation in an apartment of that kind" (i. e., like the toolroom with the doors almost "closed") "to produce death"; "when a man is overcome by gas he just gradually falls down and becomes limp, just like in a faint." There is testimony from other witnesses tending to show a much swifter process and a much more abrupt effect, violent pain, etc.

Malley knew of the dangers incident to "carbon monoxide gas," etc. Holcomb said he had told "every one" of his employees that "if they went in" the room "and closed the doors * * * you will never come out." Weeden said:

"I have discussed with Mr. Malley instances coming to my knowledge where men have been overcome with gas * * * I told * * * about a little case * * * where two couples in a Dodge touring car had got stuck in a mudhole and had to stay there all night and it was cold and the curtains were up; there was no way for them to keep warm and they ran the motor and they found them the next morning dead, with no gasoline in the tank. * * * I told * * * of that experience and * * * that it was really very poisonous."

Malley's "job" generally, and as it existed for some considerable time before May 14, 1926, was that of "watchman" and "oiler." On the night of May 14, 1926, duties assigned to him by Holcomb or Weeden, or in part by each, were: (a) "To patrol the entire beat and stay awake and watch the premises"—he was "left in charge of the premises." (b) Such as are imported by this testimony: "Mr. Malley's duties with reference to wetting down that dirt that night were these—we had a little old pump with a gasoline engine there, connected, and he used to get over there and start it up, and that was all that was necessary, and it would run then; to do that, in order to see he would have to let the light burn until he got all that started"; the pump engine was supposed to be started at about 9 o'clock. (c) To "oil" the "drag line" and get it "ready to run in the morning." (d) To store in the "toolhouse" such tools, etc., as he might discover on the premises while performing his other duties. (e) To "stop" the "gasoline engine" in the toolhouse and to "turn off the lights" there. There is testimony of Weeden indicating this should have been done about 9 o'clock p. m., but Weeden said, too, that it should have been done after Malley had started the pump and its engine, "oiled," etc., the "drag line" and "picked up tools." (f) "If it started raining," Weeden said, "I suppose it would be Mr. Malley's duty to close these doors" (i. e., doors of the "toolhouse"); he might do it or he might not; there were no specific instructions given * * * whether to close them or leave them open."

In respect to duties, authority, manner of performance of duties, etc., there is testimony that: (g) "It was left to Mr. Malley's judgment as to where he would station himself on the premises; he understood that." (h) "When a man is left in charge of premises as a night watchman" conditions might arise in respect to which "he would have to exercise his own judgment"—"nobody" was left "there to give him instructions concerning any condition that might arise." (i) "If there was downpour of rain a night watchman did not have to stay out in it"—"if nobody is there to tell him what to do he could do as he wanted to" in "sheltering himself on the premises," but, Holcomb said, "he never did, by implication, give Mr. Malley, rain or shine, authority to seek shelter or go into some place and sit down and rest."

Touching entry of the "portable toolhouse," there is testimony: (j) From Holcomb: "I did not employ him to go in the toolhouse; I never knew that he was going into the toolhouse and he had no business in it; * * * as to whether he had any business in that toolhouse for anything—he shut off the motor was all; he would cut off the motor by walking up to the side of it and shove the button, or rather pull it on or shove it off, he had no business on the inside of that toolhouse at all; * * * Mr. Malley had

been instructed by me to stay out of that toolhouse, all of the men had, * * * (and) to keep those doors open; * * * he was not supposed to go in the toolhouse or anywhere else and seek shelter and not carry on his duties as night watchman; * * * I told them to stay out of it—I had expressly told them to stay out of that toolhouse for the purpose of rest or sleep or shelter, * * * it was when we first went down there" (i. e., commenced work on the fill) "that I told every one of them not to go into the toolhouse, I told all the men 'don't ever any of you boys go into that toolhouse for any reason' when the motor is running'; I said 'if the motor is on and you closed it up you will never come out,' that is, if they went in and closed the doors—that was my reason for telling them never to go in there; * * * no conditions could have arisen where it would have been Mr. Malley's duty to go into the toolhouse, not a thing in the world." (k) From Weeden: "When Mr. Malley would be working with me he would have to go in that toolhouse for a cable, but as night watchman I never gave him any instructions or orders to go in it; his duties as night watchman did not, as I know of, call on him to go in that toolhouse under any circumstances; I never did have any authority from Mr. Holcomb to send Mr. Malley in that toolhouse to seek shelter; neither did I have any authority to send him in there to sleep; his instructions were to stay out of that toolhouse."

Rain commenced (on the "premises") about 7:30 o'clock, p. m., May 14, 1926, and of such volume as (in the judgment of Holcomb then expressed) to prevent further prosecution of the work during the night. Holcomb left the "premises" shortly thereafter, and did not return until in the morning ("daytime") of May 15th. Weeden (and all other employees except Malley) left between "eight-fifteen and eight-thirty," and did not return until about 6 or 7 o'clock in the morning of May 15th. There is testimony to show that when Weeden et al. reached a point two or three miles distant from the "premises" rain "stopped," but there is no evidence showing when it ceased on the "premises." With commencement of the "rain," the "weather turned cold." No witness appeared who had seen Malley or had any communication with him between the time of Weeden's departure the evening of May 14th and his return in the morning of May 15th.

Blair and Weeden came to the "premises" about 6 (or 6:30) o'clock in the morning of May 15, 1926, and found Malley's body within the "portable toolhouse." Description of the position, etc., of his body, etc., was given by them, respectively, as follows:

(a) "The doors were open just a little bit, about an inch I guess; they were pulled to with about an inch space opening. * * * I saw Mr. Malley lying there on his back,

dead, with his head resting on the cable coils for a pillow—that is the cable-coil was right across the back of his neck. * * * He was lying there in a sleeping position. He was lying stretched out on his back. His hat was hanging on the wall. He had a rain coat pulled up over him along about his chest as best I remember."

(b) "When I got there they had not moved Malley. * * * When I first saw him * * * he was lying in the toolhouse, lying straight out on his back with his hands right down by his side. I had loaned Malley my rain-coat * * * and when I first saw him he had that rain-coat pulled up to about his chest. His hat was hanging on the wall. He was lying with his head on a drag of cable, a three-quarter inch cable, one part of it, and the other part of it struck him in the small of the back. · * * * I should judge Mr. Malley's head was about a foot and a half from the gas engine * * * he was right in the middle there. * * * From my knowledge of the toolhouse he could not have found some other place in the toolhouse to lie down without his head being close to the engine, not unless he turned around and put his feet up there."

Overstreet reached the place shortly afterward. He testified:

"Mr. Malley's body was lying about the center of this little toolhouse with his head up near the gasoline engine, and there was a coil of * * * wire cable lying there that his head was resting on. That coil of wire was back under his shoulders like; the body lying on its back. * * * Mr. Malley was lying flat on his back stretched out. * * * He had the rain-coat pulled up over him to about * * * just about his knees. * * * The expression on the man's face indicated a calm face; he had a calm facial expression; it indicated that he had died without any struggle whatever. The body was not lying in a cramped position."

The "coil of wire cable" mentioned in the testimony of Blair, Weeden, and Overstreet contained 60 feet of "three-quarter inch" cable. Its diameter is not given, but there is in the record a photograph of a "coil" as placed within the "room," showing six or more strands.

When Weeden got to the "premises" in the morning of May 15th the "lights" were still "on." The "gasoline engine" in the "toolhouse" and the one at the "pump" were "not running." Gasoline supply at each was exhausted.

Defendant in error is the insurer, and plaintiffs in error are the beneficiaries, under the Workmen's Compensation Law, articles 8306–8309, R. S. 1925.

■ A judgment for compensation (in a "lump sum") was reversed, and thereupon judgment was rendered in favor of the insurer by the Court of Civil Appeals. 1 S.W. (2d) 923. The question for decision there and

here is whether there be evidence (of more than scintilla quantum) tending to show that Malley's death had origin in and "had to do with" the "work, business * * * of the employer."

### Opinion.

1. Since the question up for consideration is presence or lack of evidence (distinguishable from preponderance), notice must be taken of matters of interpretation and application of testimony in certain of its specific phases.

(a) That the pump engine, once started, would continue to "run" without further attention by Malley is, of course, a mere conclusion of the witness. The witness was not in a position to know, and did not pretend knowledge, that it did in fact continue to "run" after Malley had once started it—if, in fact, he did so. And so, Holcomb's declarations that "no conditions could have arisen where it would have been Mr. Malley's duty to go into the toolhouse," "he had no business on the inside of that toolhouse at all," amount to no more than fact inferences, as will be made more fully to appear hereinafter.

(b) Of the testimony about instructions given in the matter of entry of the toolhouse various things are observable.

And, first, there is room for construction. It may have been (probably, it is true) that whatever instructions were given by Holcomb were given to the employees generally ("all the men") at the time work was commenced on the "fill"; i. e., long antedating May 14, 1926.

If that be true, the fact may have two important results: Subsequent instructions (expressed or implied) of contrary import would prevail, and of these there is some evidence in Weeden's statement that Malley "would have to go in that toolhouse for a cable," in Holcomb's statement that Malley "shut off the motor was all" in reply to inquiry "whether he had any business in that toolhouse for anything," and in the broad descriptions of Malley's "discretion," authority, etc., when left in sole charge of the "premises"—all this would follow if the testimony of Holcomb and Weeden be given its broadest possible scope. But, if the time of giving instructions be fixed at commencement of the work, Holcomb restricted the meaning of his broader statements by these declarations: "I told all of the men 'don't ever any of you boys go into that toolhouse for any reason when the motor is running'"; "I expressly told them to stay out of that toolhouse for the purpose of rest or sleep or shelter." A juror then might reasonably conclude that an employee could properly enter the house for purposes other than "rest or sleep or shelter" at times when the "motor was not running," even if he fully accredited Holcomb.

But that credit is not compulsory, since in the testimony of Holcomb and Weeden about Malley's discretion and duties and prior conduct in performance of duty (viewed with the fact of Malley's sole charge of the premises, the duties to be performed that night and the state of weather), there are bases of conflict, if not irreconcilable conflict itself. Stevenson v. Barrow (Tex. Com. App.) 291 S. W. 1101.

(c) Weeden's statement (partly of a conclusion) that Malley "did not have to go into that toolhouse to get oil" (for the "drag line"), "because we kept the alemite on the machine," is disputable with his statement that "oil, etc., for the drag line were kept in the toolhouse where they could be locked up." Stevenson v. Barrow, supra.

(d) In deciding the basic question (of law) raised in the Supreme Court that interpretation must be given the evidence which will support, or tend to support, the verdict, if such interpretation be reasonable. That includes the duty of resolving conflicts in the way in which a juror might properly have done.

2. There is evidence, direct or circumstantial, to effect that: Malley was in good health and possessed of his faculties; "he was smart"; generally faithful; considerably experienced; and possessed of knowledge of perils of "monoxide gas," etc. Hence there is presumption of normality; and that precludes, inter alia, mere inference of suicidal intent.

And wrong (of which negligence, fraud, infidelity, etc., are species) will not be presumed. G., C. & S. F. Ry. Co. v. Shieder, 88 Tex. 152, 161, 30 S. W. 902, 28 L. R. A. 538.

3. It is not questioned, nor is it questionable, that Malley died in the period alotted for compliance with prescriptions of duty; that he died on the "premises"; or that the physical agencies of death were constituents of the plant of which (at the time) he had charge. Causative peril lurked in the premises. Avoidance of its results rested in diligence or intent; restated, production of its harmful results indicates at the worst "contributory negligence," a purposed turning aside from duty (and to purely selfish objects), or an intent of self-harm.

"Contributory negligence," of course, is not a defense. Nevertheless, and for instant purposes, we lay aside the question of whether on the evidence Malley's death might be attributed solely to his negligence. And while we are inclined to believe that mere violation of instructions would be included in "contributory negligence," we assume its defensive availability here.

4. There are, in our opinion, hypotheses for a proper entry of the "toolhouse" by Malley: (a) He was charged with the duty of starting the "pump," which was a "little old" one, workable with aid of a "gasoline engine"; there is testimony implying his duty to keep

the "pump" (once started) running for a considerable time and until the "dirt" was "wetted down." Weeden said, it is true, that the "pump" and "engine," once started, would continue to "run," and that, if the machinery got out of order, it was not Malley's duty to remedy the defect; yet he was not in a position to know (and did not claim to know) either that Malley was able to start the "pump" at all, or that, having been started, it did, in fact keep going without further aid; and there is testimony from Weeden and Holcomb to the effect that conditions might arise requiring Malley's independent judgment on what ought to be done. In addition to "oiling" the "drag line," Malley was supposed to get it "ready to run in the morning." Oil for the "drag line," etc., and "tools" were kept in the "house," some of which may have been needed by Malley in "starting" the pump and its engine or in "oiling and getting the drag line ready." Thus occasion for proper entry (i. e., for essential "tools" or oil) may have arisen. (b) Since Malley needed the "lights" supplied with current from the "toolhouse" plant in performance of his duties in respect to the pump and drag line, there is testimony implying duty to keep the "toolhouse" motor going so as to supply current during period for performance of those duties. That the "motor" may have stopped too soon and account of some disorder is, of course, a possibility, as is also Malley's entry in order to remedy the defect. (c) Weather conditions may have been such as to justify Malley, in use of discretion given, to enter for temporary shelter.

In direct relation to the matters stated in (a) and (b) of the last paragraph above, it is to be remembered that the "motor" in the toolhouse and the pump were still when Weeden et al. arrived at the premises in the morning of May 15th. The fact in respect to each is speculatively attributed, in testimony, to exhaustion of gasoline supply.

And, as a matter of course, what is said in that paragraph is said in view of the observations taken in "1" above.

5. Malley's hat was found "hanging on the wall" inside the building in the morning of May 15th. We assume he put it there, and that he did so in full consciousness.

A raincoat which he had been using when Weeden left the premises in the evening of May 14th was found covering his feet and legs (up to about the "knees," according to Overstreet's testimony). For reasons to be stated, we do not assume it was put there voluntarily (i. e., in full consciousness).

Malley's body when found was "on its back," and under it was a coil of "three-quarter inch wire cable." One "part" of the coil was across the "small of his back" and another "part" was "right across the back of his neck" (according to Blair) or under "his head" (according to Weeden), or "under his shoulders like" (according to Overstreet). The body was "stretched out" with the "hands right down by his side." "Facial expression" appeared "calm," and no "indications of any struggle whatever" were observed by Overstreet. Blair concluded that the "position" of the body was a "sleeping" one. Malley's "head" was "about a foot and a half from the gas engine."

There is sought to be rested in these circumstances deductions next considered:

(a) Malley, once within the room, purposely assumed a "sleeping posture," either for sleep or for rest without sleep. The circumstance of the "hat" and that of the "rain-coat," it is said, indicate preparation for the sleep, etc., which proved something more than "death's counterfeit"; position of body, it is said, implies consummation. But Malley was so "tall" as that he could not have stood upright or walked (while in upright position) in the room; his act in "hanging his hat on the wall" may have been done in facilitating performance of duty or in reasonably conveniencing himself while in shelter from the elements. That act is of equivocal import—consistent alike in the theory of purposed sleep (or of rest while "stretched out on the floor" without sleep) and in the theory of proper entry. Convulsive movements of body and limbs intervening effectiveness of the poisoned gas and death itself might explain position of the raincoat. If a man were conciously preparing for rest or sleep, it is not likely that he would so place his body as that a "part" of a cable coil would rest beneath "small of his back" and another "part" under "his shoulders like" (or under "right under his neck" or even under "his head"); hence, position of the body, of itself, does not strongly argue for meditated rest or sleep, even if in truth it does not project inference to the contrary.

And Malley entered (whatever may have been his purpose) with knowledge of the danger of staying long or of sleeping. The fact requires us to attribute to him reckless disregard of all precaution essential to his well being, if not a suicidal intent, before we may assume that he conciously placed his body in the position in which it was found or that he purposed sleep. Here, it is to be remembered, he had a choice of positions—one with his head removed from the gasoline engine by a distance greater than the length of his body, and the one (supposed to have been voluntarily assumed) with his head within a "foot and a half" of the engine.

"When one inhales carbon monoxide gas there is no pain at the time," the "inhalation * * * is something like any other anæsthetic administered," and "when a man is overcome by gas he just gradually falls down and becomes limp just like in a faint" is the purport of Dr. Kenner's testimony. That Malley did inhale gas, and therefrom died, as remarked, is not questionable. The

process of "effect" as described by Dr. Kenner might be taken as adequately explaining the position of Malley's body when found after his death.

The circumstances proved may be sufficient to raise a fact issue in that direction; but they fall much short of requiring, as a matter of law, presumption of that recklessness of conduct or that brutality of intent sought to be attributed to Malley in explanation of his death.

(b) Because Malley did the things last mentioned in (a) last above, it is said his improper entry ought to be inferred. But that he did those things at all is, of itself, a matter of pure inference; hence the pyramiding here attempted is not allowable. M. P. Ry. Co. v. Porter, 73 Tex. 307, 11 S. W. 324; United States v. Ross, 92 U. S. 284, 23 L. Ed. 707.

6. Because the hypotheses stated in "4" above (certainly, when aided by the presumptions of normality and against wrongdoing) are not conclusively negated in evidence (more especially, are not overthrown by the things discussed in "5" above), the basic question must be ruled in favor of plaintiffs in error.

7. Accordingly, we recommend reversal of the judgment of the Court of Civil Appeals and affirmance of the judgment of the district court.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.