Ramiro BENAVIDES, Administrator of the Estate of Jose M. Morales, Plaintiff-Appellant,

v.

MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Defendant-Appellee.

No. 74–2931.

United States Court of Appeals, Fifth Circuit.

July 28, 1975.

Rehearing Denied Sept. 2, 1975.

Burch Downman, Houston, Tex., Carlos F. Vela, Harlingen, Tex., for plaintiff-appellant.

Larry M. Lesh, Dallas, Tex., Liddell, Sapp, Zivley & Brown, Houston, Tex., for defendant-appellee.

Before CLARK, Associate Justice,* and GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Ramiro Benavides, as Administrator of the estate of Jose M. Morales, filed this complaint for the recovery of $30,000, the triple indemnity benefits of a life insurance policy issued by The Mutual Life Insurance Company of New York [Mutual] to the insured, Jose M. Morales. Mutual's defense was suicide by the insured.[1] The case was tried to a jury and

---

\* Of the Supreme Court of the United States (Retired), sitting by designation.

1. In addition to its face amount ($10,000) the policy provides for "An amount equal to twice such face amount, if the required due proof also shows that the Insured's accidental death occurred as the result of riding as a passenger in a public conveyance then being operated commercially to transport passengers for hire." "Accidental death" is defined in the policy as "death occurring (a) directly and independently of all other causes, as a result of accidental bodily injuries, (b) within 90 days after the date of the accident causing such injuries, and (c) from a cause not mentioned under 'Risks Not Assumed' . . .. "RISKS NOT ASSUMED—Under this rider the Company does not assume the risk of death . . . resulting from any of the following causes: su-

at the close of the evidence a single interrogatory was submitted to it for answer, as follows: "Do you find from a preponderance of the evidence that the death of Jose Morales was a suicide as that term has been defined to you?" After a 30-minute deliberation, the jury answered: "It was not suicide."

The district judge thereupon directed plaintiff to prepare a judgment in accordance with the verdict. Mutual thereafter filed a motion for Judgment Notwithstanding the Verdict, which the district judge granted after hearing argument of defense counsel only. In its reasons for granting the judgment, later reduced to writing, the District Court held that the burden was on plaintiff to prove that the death of Jose Morales was not by suicide and that he failed in that burden.

Benavides appeals, contending that the District Court erred in setting aside the verdict of the jury. We agree and therefore reverse the Judgment N.O.V.

In the early morning hours of June 18, 1972 a tragic and bizarre event occurred which brought about this lawsuit. At Harlingen, Texas a small Cessna Sky Laner commercial aircraft departed on its ill-fated flight destined for Austin, Texas. Aboard were the pilot, Eugene V. Davis, and four passengers—Jose Morales, his wife Lydia, and their two young daughters, aged two and four years. The aircraft did not reach its destination. Shortly afterwards it crashed approximately midway between Harlingen and Austin. When it was later discovered, nosedown in 8 to 12 feet of earth, what remained of the plane and its occupants had to be excavated. There were no survivors. The bodies, although partially dismembered from the impact, were found strapped in their respective seats. The body of Davis was in the pilot's seat, with Jose Morales' body beside it. Directly to the rear of the pilot's seat was the body of Lydia Morales, with those of the two children next to hers. The positions of the bodies, two bullet wounds in the back of the pilot, and a suicide note written by the obviously deranged Lydia, gave mute testimony of the cause of the crash. No one seriously disputes that the crash was caused by the insane, but intentionally-designed, plan of Lydia Morales to shoot the pilot in order to cause the plane to crash and thus put an end to her own life and the lives of her family, the unfortunate death of the pilot being merely a means to an end. What is disputed here is whether her husband was a partner in the suicide-murder plan, for under the terms of the policy suicide of the insured reduces the amount recoverable to the amount of premiums paid.

Certain suspicious circumstances suggested the possibility of suicide. The insurance policy had been issued three weeks prior to the crash. Lydia Morales, wife of the insured, stated when she arranged for the flight that the purpose of the trip was to visit her mother hospitalized in Austin, Texas, whereas in fact both her parents were in Michigan at the time. No luggage was found at the crash site. A page of a bank check register found in the wreckage contained a note written by Lydia but signed by Jose, stating that "any insurance I may have belongs to Rosendo Ledesma, Sr." [Lydia's father]. Seven years prior to the crash (and prior to the Morales marriage) Jose had purportedly exhibited suicidal tendencies because of a remark by Lydia that she did not wish to marry. An analysis of this evidence convinced the District Court that there was but one conclusion that reasonable men could have reached—that Jose Morales knowingly participated in his own death.

Inasmuch as the sole issue before us is the propriety of the District Court in granting defendant's motion for Judgment N.O.V., we must determine by an analysis of the evidence whether the trial judge was justified in finding that the

icide, sane or insane . . ." The policy further contains the clause: "In event of suicide of the Insured, sane or insane, within 2 years after the date of issue, the amount payable by the Company shall be limited to the amount of the premiums paid."

facts and inferences pointed so strongly and overwhelmingly in favor of defendant that reasonable men could not have arrived at a contrary verdict. Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, *en banc.* The evidence, a summary of which follows, convinces us that the District Court was in error.

### Plaintiff's Case in Chief

Plaintiff called one witness, Johnny Kirkendal, a Texas Highway Patrol Officer, who conducted a ground search for the crash site from a helicopter. He located the aircraft at approximately 10:45 a. m. on June 18. All of the occupants were dead. After officials of the Federal Aviation Administration arrived he helped remove the bodies from the aircraft. He said, because of his familiarity with firearms, it would have been extremely difficult, next to impossible, for Jose to have shot the pilot because of the position of Jose's body strapped to the seat alongside that of the pilot, the cramped space in the small craft, and the fact that there was no indication that anyone had removed his seat belt.

A narrative statement of the facts, conditions and circumstances of the fatal crash, prepared by the Federal Aviation Administration, introduced into evidence by plaintiff, corroborated the position of the bodies and further showed that the weapon which apparently killed the pilot was fired from the rear. The statement showed that "two 22 caliber bullet holes were found on the body of Pilot Davis just above the right shoulder blade three inches right of the midline. The two wounds, approximately two inches apart were traced up and forward. One bullet perforated the cervical spine and was not recovered. The second bullet crossed the midline of the throat structure and came to rest in muscle tissue on the front left neck."

Plaintiff's evidence was uncontradicted. The parties stipulated that the policy of insurance was in effect at the time of the crash and that the aircraft in which Jose was travelling as a passenger was a public conveyance operated commercially to transport passengers for hire.

### Defendant's Evidence

Defendant was unable to show by direct evidence that the insured's death was suicide. The record is bereft of any agreement, either verbal or written, between Lydia and Jose to enter into a suicide pact, and there is nothing to contradict the overwhelming evidence that Lydia pulled the trigger which killed the pilot and caused the crash. Mutual's defense of death by suicide consisted of circumstantial evidence, remote and mostly speculative, designed to convince the jury that Jose exhibited suicidal tendencies that culminated in a suicide pact between Lydia and himself.

Charles Sundeen, part owner of Air Central, Inc., a Cessna aircraft dealer, which also operates an air-taxi service, testified that about 9 a. m. on June 17, 1972 Lydia Morales went to Air Central and paid and arranged for a charter flight for herself, husband and children to Austin, Texas. She said she desired to leave that night as soon as possible after 11 p. m. at which time her husband was scheduled to leave work. She appeared nervous and distraught and informed Sundeen that her mother had had a heart attack and was hospitalized in Austin. Sundeen arranged for Eugene Davis to pilot the flight on a Cessna Sky Laner No. 182, single-engine, 4-seated airplane, with 2 seats in the front and a bench seat in the back. This was the extent of Sundeen's knowledge of the incident. He was not at the airport when the plane departed, and he had never met Jose.

Omar Lucio, the police officer at Harlingen who conducted an investigation after the fatal crash, tried to contact relatives of the Morales family. He said he was told in the neighborhood that the family had gone north to visit a sick relative. He entered the Morales residence and found in the living room on the top of a stereo console a tablet which contained several notes, including the note, "Time Went By, Time to Die,

How? Fly in the Sky. Good Bye." Officer Lucio said he was later met by Sergeant Trevino, another police officer for the City of Harlingen. Trevino indicated to Lucio that he also had found notes in the glove compartment and sun visor of the Morales vehicle parked at the airport. On cross-examination, Lucio said that the notes appeared to be in the same handwriting. Some of them were signed by Lydia. He could not recall any being signed by Jose.[2]

E. Ray Bright, Jr., Justice of the Peace of Gonzales, Texas, whose duties also include acting as coroner and conducting inquests into causes of death within his precinct, testified for the defense. He prepared a written report in which he concluded that "Jose and Lydia Morales intended to commit suicide and that one or the other of them killed the pilot." The conclusion that Jose possibly caused the death of pilot Davis is in conflict with all the positive evidence, and as will be seen from Bright's complete report in the Record of Inquests, his assumption that Jose had the intention of suicide is based entirely on hearsay and speculation. Bright's findings stated:

On June 18, 1972 at about 11:50 A.M. I received a call from the Sheriff's Department at Gonzales, Texas that I was needed to perform an inquest located in a brushy area on the Daniel Lyssey ranch about 20 miles southeast of Gonzales, Texas.

On arriving at the scene I found an airplane had crashed and killed 5 per-

---

2. The various notes taken from the Morales' living room and the automobile were introduced into evidence by defendant. They are substantially of the same tenor, evidencing knowledge by Lydia that she was physically and mentally sick, her desire to end her own life, her love for her children and her husband. None of the notes indicate any knowledge or participation by Jose in Lydia's death plans. Typical of the suicide notes is the following:

"Dear family and husband; Darling husband and children:

I know that for as long as I try I won't be any good. My health is so bad I know I can't make it. You see I have Cancer of the Brain and I've been told I'm going to die. But I'm scared and can't wait. I'm sorry I haven't been a good mother for some time. Since I found out this I started slipping out on you. I love you with all my heart. Mary Lou, please try to help my children through the roughest spots—cut their hair and make sure they eat cause for sometime I know they'll need someone like you.

And as for Joe, please be patient with him. He deserves the best in life cause he's the greatest husband a woman could have. I love him and nothing from this act is his fault. It's me. I can't control myself anymore. It's my brain that's no good. Please, please do not try to give me a fancy funeral. I want my blue pant suit and simple, cause my husband can't afford it. He's in a lot of bill problems, please help him out.

My parents are very good, please help them see I was sick for a long time. I fought things for as long as I can remember. I love them and my husband and children. Try to help my parents. They've had a hard life. I've always been very selfish. Thought I was doing my best for everyone but it always turned out wrong.

I'm not sane anymore so please don't try to make me live. The sooner I go the better for me and eventually for my children too and husband. I'm not sane not since the cancer started eating my brain. I knew it but I couldn't believe it true.

Darling husband. Don't ever feel guilty about my death, you see if you ever feel guilty it was cause you were so easy with me. Honey, I loved you only I'm some kind of a freak, afraid of life in every way. I never was a real woman to you but God has to give you someone who'll really help you out. I'm just not sane anymore and the longer I stay in this world the longer I'll stay in my children's memory so I don't want to anymore.

I love you and it's all my fault Joe, I've never felt peace within me, always been too nervous and unlike me. But it's cause I have cancer in the brain. Take care and take care of the children."

Other notes in the same handwriting reveal Lydia's intention to have the family die with her. For example, she wrote:

"I have really wrecked our home—me and my stupidity of not speaking out to say I needed help a long time ago. I've dragged my family down, but I'm sick. I'd rather see them dead including me. I love them that's why. [signed] Lydia." and,

"I did this on purpose. I'm psychic I guess but I see what pessimism brought my family. I can't take it. I'd rather see them dead first. Believe me I love my family. I've always felt insecure because of inner illness. I'm so nervous I can't wait to die. But I won't let my family behind."

sons. Also at the scene with me in this investigation was J. C. Kuykendoll with the Department of Public Safety and Dr. John C. Davis of Cuero, Texas with the F. A. A. I found out later F. A. A. had ruled out engine failure. Since the plane came straight down it lead me and others to wonder what really happened.

After finding the names of the people in the wreck I phoned the Harlingen police and they advised me that they had found a note written by Mrs. Lydia Morales that stated "Time went by. Time to die. How? Fly in the sky. Goodbye." There were other suicidal notes found at the Morales home the next day. Lydia Morales had her bank record book on the plane and in it was found in Jose Morales handwriting "Any insurance I may have belongs to Rosendo Ledesma, Sr." I also found out from the Harlingen police that Jose Morales was the proud owner of a .22 cal. two shot derringer that could have possibly been used as the weapon that killed the pilot, Eugene W. Davis. An autopsy was ordered on the bodies of the pilot and Jose and Lydia Morales. The autopsy showed the pilot had been shot in the throat and in the back. The bullet lodged in the pilots throat found by Dr. Ruben Santos, the pathologist, was a 22 short which I believe was from the little pistol. The gun was never found.

Investigation also found that Jose Morales told his boss, Bobby Cosnell, who operates a Mobil Home Sales lot in the Rio Grande Valley city of Harlingen that Jose Morales had told him he had chartered an aircraft because his wife's mother was in an Austin hospital. Officials however said no ill relatives were located in the Austin area. I checked at the scene of this accident for luggage but was unable to find any.

The fatal crash occurred about 3 A. M. but I was not called until the crash site was found. The plane was spotted by the Civil Air Control about 5 hours after crash.

My findings after a complete investigation into this incident is that Jose and Lydia Morales intended to commit suicide and that one or the other of them killed the pilot, Eugene W. Davis, Jr., causing the aircraft to crash. My ruling for the children, Belinda and Shelly Morales, is ruled as homicide.

The statement in the acting coroner's report that the note relative to insurance was in Jose's handwriting is erroneous and was retracted by the witness Bright on cross-examination who admitted that only the signature in the check record book was in Jose's handwriting.[3] He also admitted that the note was in the same handwriting as the suicide notes written by Lydia. Bright's reference to Jose having told his boss Bobby Cosnell [Gosnell] that he, Jose, had chartered an aircraft is hearsay. Gosnell did not testify. There is no way of ascertaining from this record what, if anything, Jose told Gosnell regarding the contemplated flight. The undisputed evidence of what actually occurred, as shown from the testimony of Sundeen who arranged the flight, is that Lydia chartered the flight. Another significant conflict in the report, also in the nature of hearsay, refers to the ownership of the .22 caliber derringer. The file of the United States National Transportation Safety Board, introduced as a defense exhibit, contains an affidavit by Gosnell in which he states:

"Last Tuesday or Wednesday, June 13–14, 1972 Jose Morales told me he

---

3. Another instrument, unrelated to the case, but bearing the signature of Jose Morales, established by comparison the authenticity of Jose's signature. It is difficult to determine, however, what, if any, inference or significance the jury drew from the exhibit. Lydia's note was written diagonally across the upper portion of the divided page. Beneath it in the same handwriting is an undecipherable scrawl. The signature of Jose appears on the lower part of the page and is angled in a direction different from the note. The note was not dated.

had brought his father-in-law's .22 caliber two barrel derringer to the office so his kids wouldn't be messing with it, and he wanted to know if I had removed it from his desk while he had gone to town for me. I told him I didn't remove it, but I also told him his wife had been in the office to see him and then left. I was busy with a customer and do not know if she went through his desk or not."

Even if we were to assume that the report prepared by Bright contained only undisputed and validly admissible facts, it is difficult for us to understand how Bright concluded that Jose intended to commit suicide and that he, if not Lydia, killed the pilot. Bright had never met Jose, he had never seen or heard of any mutual suicide pact, and he knew of no one who might have overheard them making such an agreement. The fact that he found no luggage at the crash site is not determinative that none was taken aboard. The area was wooded, parts of the disintegrated plane were scattered about, the nose section was engulfed deeply in the ground. The pistol was never recovered, and according to the report of the pathologist who performed the autopsy, various parts of the bodies were missing.

Ramiro Benavides, plaintiff and half-brother of Jose, testified that he raised Jose from birth. In 1965, seven years prior to the airplane incident, Jose brought his prospective bride, Lydia, to the Benavides residence to introduce her to the family. Lydia announced that she did not want to marry. Distraught by that announcement, Jose ran to a nearby warehouse and began ramming his body against a wall. Benavides called the police and Jose was finally subdued. A police officer showed Benavides a knife that Jose was flourishing. As a result of the incident Jose was detained in jail overnight so that he could "cool off". On cross-examination Benavides said that he had never known of Jose trying to kill himself and knew of no notes ever having been written by Jose which would indicate that he at any time contemplated suicide. Jose worked in Dallas for 3 or 4 years after which he came to Harlingen, Texas, where after a short time he secured a job selling mobile homes on a commission basis. Jose never appeared to be abnormal, crazy, depressed or suicidal. To the contrary, he was a normal, happy young man.

Rosendo Ledesma, brother of Lydia Morales, testified that Jose and Lydia returned to Harlingen from Dallas in April, 1972 and took up residence with Lydia's parents. Two weeks prior to the plane crash the parents left for Michigan where they remained until after the accident. Ledesma testified that he thought Jose knew that Lydia's parents were in Michigan because Jose and Lydia were living with the parents at Harlingen when they, the parents, departed for Michigan. There is nothing in the record however to establish what Jose actually knew about the whereabouts of the senior Ledesmas. It is not inconsistent to reason that the jury believed that Lydia, determined to go through with her death plan, convinced Jose that her mother was in fact hospitalized at the time in Austin.

Claudio Castenda, Jr., an officer of the Harlingen Police Department, confirmed the incident involving Jose's reaction to Lydia's announcement that she did not intend to marry. When he first saw Jose he was running towards the warehouse, then ran into it. Jose had a knife and told Castenda to leave him alone and that he would kill himself as well as Castenda if he interfered. He eventually subdued Jose by cocking his service revolver, whereupon Jose started crying and threw down the knife. Jose was put in a patrol car and held overnight in jail for his own protection. On cross-examination, Castenda said that he knew of no further trouble between Jose and the police.

Defendant's final witness was Dr. James P. Grigson, psychiatrist, whose testimony based on hypothetical statements, was that both Jose and Lydia "were destroying themselves or killing themselves, committing suicide at the

same time, and the children." He further commented, "The husband apparently has made several previous suicide attempts or gestures at least. Whenever you have repeated attempts such as that you are talking about an individual that is emotionally unstable to say the least." After again commenting on Jose's previous suicide attempts the Court reminded Dr. Grigson that the hypothet presented to him included only one alleged suicidal attempt in 1965. Dr. Grigson replied that that would not alter his opinion in any respect. It is noted that the doctor was given no history of Jose ever having consulted a psychiatrist or of having been hospitalized for any mental disorder. Obviously, the jury discounted Dr. Grigson's psychiatric evaluation of Jose.

*Plaintiff's Evidence in Rebuttal*

Maria Elva Chamberlain testified that she knew Jose since childhood, renewed her acquaintance with him in high school and saw him again in 1972 after he had returned from Dallas to Harlingen. She saw him the same week of the crash as she and her husband were looking for a house trailer at that time. He told her that he and Lydia now had two beautiful children and exhibited pictures of them. He seemed very happy and was proud of his two little girls. He told her that the Mobile Home would cost about 10 to 12 thousand dollars and that if she bought it from him it would be a great commission for him. He was happy about the prospective commission. He at all times appeared very normal.

Arturo Avilla testified that he knew Jose since childhood. He had never known of Jose having attempted suicide; he always seemed perfectly normal. They played pool together 3 to 4 days before the crash and there was nothing abnormal about him, no indication that he was contemplating suicide. Jose told him that he was doing well in his job selling trailers; he was not depressed.

Reverend Michael Anthony Annunziato, pastor of the Catholic Church in which Jose and Lydia were parishioners, met Lydia shortly after the couple arrived in Harlingen. Lydia was a very erratic person. The day before the crash she called Father Annunziato to say she was going to fly to Austin because her mother was hospitalized there. After midnight Saturday, shortly before the plane took off, she called him to say that she had talked Jose into going along and taking the children. The witness had also talked to Jose on 5 or 6 occasions. Based on his conversations with him and his observations, Jose was normal and had no suicidal tendencies. The last time he talked with Jose was during the week of the fatal crash at which time Jose told him how happy he was with his new job selling mobile homes, and that he would be able to reduce some of their debts once his commissions came in. At that time he was perfectly normal. As a Catholic priest he had had lots of experience with suicidal tendencies in individuals.

*The Presumption against Suicide and the Burden of Proof*

In Texas there is a very strong presumption against suicide. Reserve Life Insurance Co. v. Estate of Shacklett, Tex.Civ.App., 1967, 412 S.W.2d 920, 922; Combined American Insurance Company v. Blanton, Tex., 1962, 353 S.W.2d 847, 849; Great Southern Life Ins. Co. v. Watson, Tex.Civ.App., 1961, 343 S.W.2d 921, 923; Southland Life Ins. Co. v. Brown, Tex.Civ.App., 1938, 121 S.W.2d 653, 655; Langlitz v. American Nat. Ins. Co., Tex.Civ.App., 1940, 146 S.W.2d 484, 487; Malley v. Union Indemnity Co., Tex.Com.App., 1929, 12 S.W.2d 1002, 1005; Aetna Life Ins. Co. v. Tooley, 5 Cir., 1926, 16 F.2d 243, 244. The presumption, however, is not evidence and may be rebutted by evidence to the contrary. Combined American Insurance Company v. Blanton, supra, 353 S.W.2d at 849; Langlitz v. American Nat. Ins. Co., supra, 146 S.W.2d at 487; Aetna Life Ins. Co. v. Tooley, supra, 16 F.2d 244.

The District Court's instructions to the jury, however, omitted any reference to the presumption against suicide. Affirmatively, the court charged

that the beneficiary had the burden of proving that the death of Jose was accidental and not suicide. Consequently the jury verdict that Jose's death was not suicide was reached without the benefit of the presumption and despite the heavy burden on the beneficiary of proving a negative. The question of who sustains the burden of proof is substantive and in a diversity case is therefore controlled by state law. Prudential Insurance Company of America v. Schroeder, 5 Cir., 1969, 414 F.2d 1316, 1319; 1A Moore's Federal Practice ¶ 0.–314[2]. We note an apparent conflict in the Texas jurisprudence on the question of who bears the burden of proving suicide in a suit claiming accidental death benefits.[4] Nevertheless, since appellant does not raise the matter as an issue, and since we find that the preponderance of evidence is reasonably susceptible of a finding of accidental death and not suicide, the question becomes academic.

4. Although Texas law clearly requires a beneficiary claiming insurance proceeds under an accidental death policy to prove the necessary elements of accidental death [which reasonably implies as an element, the negative thereof—not suicide], there is abundant authority that the burden of proof on the issue of suicide is on the insurer. *See*, e. g., Reserve Life Insurance Co. v. Estate of Shacklett, Tex.Civ. App., 1967, 412 S.W.2d 920, 922; Southland Life Ins. Co. v. Brown, Tex.Civ.App., 1938, 121 S.W.2d 653, 655; Aetna Life Ins. Co. v. Tooley, 5 Cir., 1926, 16 F.2d 243, 244. *Contra*, Combined American Insurance Company v. Blanton, Tex., 1962, 353 S.W.2d 847, 849; Langlitz v. American Nat. Ins. Co., Tex.Civ.App., 1940, 146 S.W.2d 484, 487. However, the two latter cases, *Combined American Insurance Company* and *Langlitz*, which were cited by the District Court as controlling, both recognized the presumption against suicide. In *Combined American Insurance Company*, the Court found that the presumption against suicide could not prevail against the evidence produced by the insurance company. The presumption, the Court said, "places on the party against whom it operates the burden of producing evidence. The defendant has rebutted this presumption with facts showing suicide." 353 S.W.2d at 849. In *Langlitz*, the Court found that the presumption vanished as a result of admissions made by the beneficiary:

*Conclusion*

■ Plaintiff's evidence in chief proved that the insured died as the result of a crash of a public commercial aircraft in which he was riding as a passenger and that the crash was precipitated by the shooting of the pilot by someone other than the insured, thus negating suicide and bringing the death under the triple indemnity provisions of the policy. Although the defense presented circumstantial evidence from which the jury might have inferred that the insured intended self-destruction, because of the speculative quality of the evidence we cannot say that any such inferences, if they existed in the minds of the jurors, were not dispelled by plaintiff's rebuttal witnesses. Applying the criteria of Boeing Company v. Shipman, supra, the verdict of the jury must be reinstated.[5]

Reversed.

"Beneficiary testified that on the day of Insured's death she made a proof of loss as to another policy on the life of Insured in which she stated that suicide was the cause of Insured's death. . . . This testimony alone, we think, eliminated any operation or effect of the presumption relied upon." 146 S.W.2d at 487.

5. In Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374, *en banc*, we said:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence— not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury."