### Ernest Benjamin SMITH

v.

### W. J. ESTELLE, Jr., Director, Texas Department of Correction, and Warden, Ellis Unit, Texas Department of Corrections.

### No. CA3–77–0544–F.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 30, 1977.

New Trial Denied March 27, 1978.

John F. Simmons, Dallas, Tex., Joel Berger, New York City, Anthony G. Amsterdam, Stanford, Cal., for petitioner.

Joe B. Dibrell, Jr., Asst. Atty. Gen., Chief, Enforcement Div., Anita Ashton, Asst. Atty. Gen., Austin, Tex., for respondents.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

During the early morning hours of September 28, 1973, Ernest Benjamin Smith and Howie Ray Robinson entered a Schepps Grocery in Dallas County, Texas, intending to rob the store. Robinson placed a package of lunch meat and a jar of mustard on the counter while Smith held a gun on the cashier and said "This is a holdup". The cashier moved suddenly as if to reach for something and Smith yelled either "Get him Howie" or "Look out Howie." Robinson then fatally shot the cashier. Smith and Robinson removed the money from the register and a gun from underneath the counter and left for the home of a friend where they divided the money.

Robinson and Smith were apprehended and charged with the offense of murder with malice aforethought in the course of a robbery. Judge R. T. Scales of the 195th Judicial District Court of Dallas County appointed John Simmons to represent Smith and, one year later, appointed attorney Howard G. Wilson to assist Mr. Simmons. A motion to sever Smith's case from his co-defendants' was granted.

Robinson's case went to trial and he was convicted. However, on April 20, 1977, this conviction was overturned by the Texas Court of Criminal Appeals which held that admission of testimony that a state's witness had taken and passed a lie detector test was reversible error. *Robinson v. State,* 550 S.W.2d 54 (Tex.Cr.App.1977). Robinson was retried and again convicted. On December 2, 1977, however, Texas District Court Judge Richard Mays granted Robinson a new trial and the case is currently pending. *State of Texas v. Howie Ray Robinson,* No. C–74–3195–PNQ.

In the Smith case the grand jury returned a bill of indictment on December 28, 1973 and the state gave notice that it intended to seek the death penalty. Some time prior to February 18, 1974, Judge Scales instructed the state's attorney Doug Mulder to arrange a psychiatric examination of Smith by Dr. James P. Grigson, a psychiatrist.[1] Dr. Grigson was asked to determine whether Smith was competent to stand trial.

"In all cases where the State has sought the death penalty," Judge Scales testified in this proceeding, "I have ordered a mental evaluation of the Defendant to determine his competency to stand trial. I have done this for my benefit because I do not intend to be a participant in a case where the Defendant receives the death penalty and his mental competency remains in doubt."

Dr. Grigson visited Smith on February 18, 1974 and after a ninety minute examination concluded that the defendant was competent to stand trial. In a letter to Judge Scales Dr. Grigson wrote: "It is my opinion that Ernest Benjamin Smith, Jr. is aware of the difference between right and wrong and is able to aid an attorney in his defense." This conclusion approximates the test for competency.[2] Dr. Grigson's letter was filed among the court papers.

■ This competency evaluation was ordered even though Mr. Simmons and Mr. Wilson had not put into question Smith's competency to stand trial or the related psychiatric issue of Smith's sanity at the time of the offense. Judge Scales' practice of ordering competency hearings in death penalty cases, however, cannot be faulted in the least even when the issue has not been previously raised. The Court has authority to protect the integrity of the judicial system by making certain only mentally competent defendants stand trial.

It is also Judge Scales' practice to notify defense counsel that the psychiatric examination will be conducted. However, inexplicably in this case that notification was never received by either Mr. Simmons or Mr. Wilson. No formal order of appointment was entered and possibly due to the heavy workload of the Court, less formal notification was not accomplished. Dr. Grigson never filed a written report of his evaluation[3] but did send a letter summary of his conclusions to Judge Scales. Again, through some mixup, Mr. Simmons and Mr. Wilson never received a copy of this letter and first discovered it while reviewing the court papers after picking the jury in Smith's trial which commenced on March 11, 1974. This was their first notice that a

1. Statement of Facts. *State v. Smith* (hereinafter cited as "Record") Vol. VI at 2929. [I will refer to the numbers on the bottom of the pages in the record. A different set of numbers appears at the top of each page.]

2. *See Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

3. This failure to file a written report of the examination would violate Art. 46.02 § 3(d) of the Texas Code of Criminal Procedure which was amended after Smith's trial. The section provides:

A written report of the examination shall be submitted to the court within 30 days of the order of examination, and the court shall furnish copies of the report to the defense counsel and the prosecuting attorney. The report shall include a description of the procedures used in the examination, the examiner's observations and findings pertaining to the defendant's competency to stand trial, and recommended treatment. If the examiner concludes that the defendant is incompetent to stand trial, the report shall include the examiner's observations and findings about whether there is a substantial probability that the defendant will attain the competence to stand trial in the foreseeable future.

psychiatrist had been appointed and had examined the defendant. Mr. Simmons testified that "although I had not known of the letter or the visit before seeing the letter in the file, I attached no significance to it. From the contents of the letter I just assumed that Judge Scales wanted to be satisfied in his own mind that the defendant was competent to stand trial. He had never asked me that question but if he had I would have answered affirmatively. Ernest had never had any mental problems and was above average intelligence in my opinion."

Logically Dr. Grigson's appointment should not have concerned Mr. Simmons. A motion to discover the state's list of witnesses had been granted and Dr. Grigson's name did not appear. There was therefore no danger that possibly incriminating statements made by Smith to Dr. Grigson would be used at the guilt or innocence stage of the trial. There was also no reason to believe Dr. Grigson would be used at the punishment stage. The question of competency or sanity had never been raised, no prospective juror was questioned on this issue and absolutely no evidence at the guilt or punishment stage was introduced by the defense as to Smith's competency, sanity or any other potential personality disorder.

The capital murder trial in Texas is held in two stages. In the first stage the jury determines whether the defendant is guilty or innocent of the offense. The jury found Smith guilty as alleged in the indictment. Once guilt has been established the trial moves into the punishment phase. After hearing evidence in this proceeding, the jury must determine on the basis of all the evidence it has heard whether the Defendant should be put to death or given a life sentence. The death penalty may be imposed only if the jury answers "yes" to each of three special issues submitted to it.[4]

The state has the burden of proving beyond a reasonable doubt that these answers should be "yes". If the state fails in its proof or if the jury answers "no" on any one of these three issues the death penalty may not be imposed.[5] Because the state has the burden of proof it introduces testimony first in the punishment proceeding followed by the defense.

In this case, however, the state took the unusual step of resting subject to reopening.[6] Judge Scales permitted this procedure after making clear on the record that the state had the right to go first.

Mr. Simmons called three witnesses, one of whom testified, in effect, that Smith's gun was broken and would not fire on the

4. The special issues—as provided in Art. 37.-071(b) of the Texas Code of Criminal Procedure Supp.1976–77 read:

1. whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

2. whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

3. if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

5. *Jurek v. State of Texas,* 428 U.S. 262, 269, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

6. The Court: As I understand it, Mr. Mulder, you are going to rest—how do you want to word it? Subject to the right to reopen? Mr. Mulder: Whatever your pleasure is. However, I don't think they're going to know one way or the other. We can do it right now. They can come in, and the Defense and be calling witnesses?

The Court: Mr. Simmons?

Mr. Simmons: I didn't understand.

The Court: He doesn't have any testimony right now, but will have.

Mr. Mulder: We will rest right now in the record.

The Court: Subject to your right to reopen if they don't put on any testimony?

Mr. Tokoly: I think since we are permitting them to go first, if they can start putting on their testimony as if that's the normal thing to do, then we will put on our testimony after theirs.

The Court: That's fine. Since the state has the right to go first, I wanted to show something in the record concerning you resting at this time.

Mulder: That's fine, Judge, with that understanding.

Record at 2910–11.

night of the robbery. Smith's step-mother, the second witness, testified that the defendant had graduated from high school, that he was a truthful person and that he had received an honorable discharge from the military service. Smith's aunt, the third witness, corroborated the step-mother's testimony. The defense rested. Mr. Mulder then announced his intention to call Dr. Grigson. Mr. Simmons objected and this objection was overruled. When this occurred Mr. Simmons asked that the prosecution not be permitted to tell the jury that Dr. Grigson was appointed by the court. Judge Scales initially granted this motion but, after hearing additional argument from Mr. Mulder, reversed his ruling. The jury was informed that Dr. Grigson was the court appointed psychiatrist. They were not told he was appointed for the sole purpose of determining Smith's competency to stand trial. Mr. Simmons was permitted to take Dr. Grigson on *voir dire* out of the presence of the jury and it was established that Mr. Mulder had contacted Dr. Grigson the previous Thursday and said that his testimony would be needed in the Smith case. Dr. Grigson, who does much court related work,[7] responded that he would be available when needed.

Dr. Grigson's psychiatric testimony may be summarized as follows. On direct examination he testified (1) to his credentials as a psychiatrist; (2) to the types of examinations administered by him to Smith; (3) to the results of those examinations; (4) that Smith is medically and legally sane; (5) that Smith has a sociopathic personality disorder; (6) to the characteristics of the sociopath; (7) that there are degrees of sociopathy and Smith is on the very severe end of that scale; (8) that the prognosis is Smith will continue his previous behavior or get worse; (9) that Smith has no regard for other persons' property or lives; (10) that no treatment to improve his condition exists; (11) that Smith will commit criminal acts of violence that will constitute a continuing threat to society if given the opportunity to do so; (12) that Smith is a leader. On cross examination Dr. Grigson testified (1) that it is not known what causes a person to be a sociopath; (2) that for the basis of his diagnosis, he spent approximately an hour and one-half examining Smith but did not interview friends and relatives who knew Smith with the exception of Howie Robinson whom he examined in connection with Robinson's criminal trial arising out of the same incident; (3) that he is certain that Smith is a severe sociopath; (4) that his diagnosis of sociopathic personality was based on Smith's failure to show any guilt feelings or remorse with respect to the commission of the offense for which he was on trial; (5) that during the examination Smith was pleasant, cooperative, polite, intelligent, rational, courteous, and did not try to fake insanity; and (6) that sociopathic symptoms may show up as early as

7. Dr. Grigson testified that at the time of the trial he had been in full time private practice for about six years and six months. Record at 2933. He had examined almost 8,000 persons charged with criminal offenses and had testified several hundred times in court. For appellate cases where Dr. Grigson's testimony has been at issue see e. g., *Bruce v. Estelle,* 536 F.2d 1051, 1060 (5th Cir. 1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977) (Judge Mahon's reliance on Dr. Grigson's diagnosis held clearly erroneous); *Benavides v. Mutual Life Insurance Co. of New York,* 516 F.2d 393, 398–99 (5th Cir. 1975); *Bruce v. Estelle,* 483 F.2d 1031, 1035, 1038–40 (5th Cir. 1973); *Collins v. State,* 548 S.W.2d 368, 377–78 (Tex.Cr.App.1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977); *Graham v. State,* 546 S.W.2d 605, 609 (Tex.Cr.App.1977); *Ex Parte Dickey,* 543 S.W.2d 99, 104 (Tex.Cr.App.1976); *Livingston v. State,* 542 S.W.2d 655, 661–62 (Tex.Cr.App. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Lee v. Thomas,* 534 S.W.2d 422, 424 (Tex.Civ.App. Waco, 1976, ref., n. r. e.); *Hicks v. State,* 525 S.W.2d 177, 180 (Tex.Cr.App.1975); *Garza v. State,* 522 S.W.2d 693, 694 (Tex.Cr.App.1975); *Jackson v. State,* 516 S.W.2d 167, 173 (Tex.Cr.App.1974); *Hurd v. State,* 513 S.W.2d 936, 946 (Tex.Cr. App.1974); *Culley v. State,* 505 S.W.2d 567, 569 (Tex.Cr.App.1974); *Armstrong v. State,* 502 S.W.2d 731, 735 (Tex.Cr.App.1973); *Wilborn v. State,* 491 S.W.2d 432, 433 (Tex.Cr. App.1973); *Boss v. State,* 489 S.W.2d 580, 582 (Tex.Cr.App.1973); *Williams v. State,* 463 S.W.2d 15, 17 (Tex.Cr.App.1971); *Blankenship v. State,* 432 S.W.2d 945, 946–47 (Tex.Cr.App. 1968).

age four or five, or may not appear until age thirty.[8]

Dr. Grigson was the state's only witness at the punishment phase. After his testimony concluded, the jury retired to consider its verdict. It returned with "yes" answers to all three questions which meant that under Texas law Ernest Benjamin Smith would be put to death. The Texas Court of Criminal Appeals affirmed Smith's conviction and his sentence.[9] The United States Supreme Court denied certiorari.[10] A state writ of habeas corpus was denied by Judge Scales on April 18, 1977. The Texas Court of Criminal Appeals denied a similar writ on April 19, 1977 and Smith's execution was set for April 26, 1977. On April 22, 1977 I entered an order staying that execution pending review of Smith's federal writ of habeas corpus filed April 21, 1977.

That review has now been completed and because I find the death penalty was imposed in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution it is hereby vacated. No constitutional error has been found with respect to the guilt phase of the trial.[10A]

Having reviewed the relevant facts of this case and having stated my legal conclusions, I would like to elaborate on why these facts present issues of constitutional dimension.

## A.  Due Process of Law.

■ A majority of the United States Supreme Court has held that the death penalty not only differs in degree from any other punishment that may be imposed but that it is different in kind. It is therefore imperative both to the defendant and the community that the decision to impose the death penalty reflect a reasoned judgment devoid of caprice or emotion and derived from all the available evidence presented at a fair proceeding. *See Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

■ The fairness of the sentencing process is measured by the due process clause, and, as it is a critical stage of the criminal

8. The summary of Dr. Grigson's testimony is borrowed largely from the excellent summary found in Judge Odom's opinion dissenting in part from the ruling of the Texas Court of Criminal Appeals in this case. After the U.S. Supreme Court ruled in *Jurek,* Judge Odom withdrew his dissent. One other matter concerning Dr. Grigson's testimony concerns this Court.

Dr. Grigson testified that: "With regard to his (Smith's) emotional state, for the most part throughout the examination he was very pleasant, very cooperative, very polite. The one significant fact which was present was I could find absolutely no signs of any remorse or any type of guilt feelings. I thought this was very important in the situation that existed."

"Again, I could find no remorse feelings, no guilt feelings."

Record at 2941.

It appears that Smith made a "quasi" confession during the course of the examination as was brought out during cross examination of Dr. Grigson. Record at 2950–52. Therefore, it appears that Smith, in effect, established his guilt in Dr. Grigson's eyes which enabled him to determine that the defendant showed no remorse or guilt feelings which in turn formed the basis for the diagnosis. Although not the case here, it troubles this court that a psychia-

trist might, during an examination where no "confession" is given, assume the defendant's guilt which then forms the basis of the psychiatric diagnosis. This certainly seems to be at odds with the presumption of innocence to which all criminal defendants who plead not guilty have a constitutional right.

9. *Smith v. State of Texas,* 540 S.W.2d 693 (1976).

10. 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977).

10A. The State takes the position that Smith may not be retried under state law on punishment alone. Thus, the State contends, that if Smith is to be given the death penalty he must also be tried again on guilt or innocence. This is a question of state law and need not be addressed here. If permissible under state law the attorney general may wish to forego a retrial on punishment which would result—presumably—in a life sentence. Whatever decision the Texas Court of Criminal Appeals reaches on these issues it should be clearly understood that I find constitutional violations only at the punishment stage and not during the guilt or innocence proceedings.

proceedings, the defendant is entitled to the effective assistance of counsel. "The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process. *Gardner v. Florida, supra,* 430 U.S. at 358, 97 S.Ct. at 1205.

As the Supreme Court has often stated "once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In general the procedural protections required by the due process clause vary according to the demands of the particular situation. In this case I find that because of the private interest affected by the government's action the situation demanded more procedural protection than was afforded.

The state's evidence at the punishment stage was introduced in such a way as to deny defense counsel effective cross examination of Dr. Grigson. It is impossible for even the best lawyers to effectively cross examine a medical expert without any preparation. A review of the record shows that Mr. Simmons was not an exception to this rule. Although a psychiatrist's methodology and conclusions are susceptible to impeachment by those knowledgable in the field, they are virtually impregnable to

challenge by one who is not a psychiatric expert and totally unprepared to question on this subject matter. Mr. Simmons did not know that Dr. Grigson was going to be a witness at the punishment proceedings until a few minutes before he was called. Effective cross examination under these circumstances was virtually impossible. Criminal convictions have been reversed in the past when they have been procured through government "cloak and dagger" tactics in introducing surprise testimony. *See Riggs v. United States,* 280 F.2d 750, 753–54 (5th Cir. 1960).

Dr. Grigson's testimony was also presented—after the defense had rested—in a manner which precluded the opportunity to obtain expert psychiatric testimony for the defendant.[11] Effective cross examination and the ability to obtain a psychiatric expert for the defendant are especially critical when psychiatric testimony is introduced because studies have shown that the opinions of psychiatrists in this area are often unreliable and invalid.[12] The unreliability and invalidity of the opinion is heightened where, as here, the psychiatrist is appointed for one purpose—to determine competency—but testifies on a completely different matter—whether the defendant will commit similar acts of violence in the future, (hereinafter referred to as "dangerous-

11. The Fifth Circuit Court of Appeals has held that failure to provide expert psychiatric assistance may deprive an indigent defendant of effective assistance of counsel. *Greer v. Beto,* 379 F.2d 923, 924 (5th Cir. 1967). *Hintz v. Beto,* 379 F.2d 937 (5th Cir. 1967).

12. "Reliability" and "validity" are terms of art found in the psychiatric literature. Reliability does not have a precise meaning. See L. Cronbach, Essentials of Psychological Testing 173–82 (3rd ed. 1970). Reliability generally refers however, to the probability or frequency of agreement when two or more independent observers answer the same question. For example, is Smith dangerous? If representative pairs of psychiatrists, interviewing a representative sample of prospective patients, usually agree that each individual is or is not "dangerous" the judgment of "dangerousness" is said to be reliable. Conversely, if pairs of psychiatrists would not usually agree wither such indi-

viduals are dangerous, that judgment is said to be unreliable.

"Validity," on the other hand, refers to not how likely psychiatrists are to agree to a particular judgment but to how accurate their judgments are. If every psychiatrist in the world agrees that Smith would commit a dangerous act if released from the hospital, that judgment would be 100% reliable. But if Smith were released and does not commit a dangerous act, the judgment would be invalid. Similarly, psychiatric judgments of "dangerousness" would be generally reliable if most observers would agree whether or not given individuals are dangerous, yet invalid if those judgments usually would be wrong.

For studies detailing the invalid and unreliable nature of psychiatric examinations *see, generally* Ennis & Flitwack, Psychiatry and the Presumptions of Expertise: Flipping Coins in the Courtroom, 62 Cal.L.Rev. 693, 697 (1974) (Footnotes omitted).

ness").[13] The prejudice is compounded when the Court—by permitting the prosecutor to inform the jury that the doctor is court appointed—vouches in effect for the accuracy of the psychiatrist's opinions on "dangerousness" even though the judicial appointment was to determine "competency".

Even a cursory review of the psychiatric literature reveals that psychiatrists differ widely in their diagnosis of the same patients. The testimony of psychiatric experts is receiving increased judicial scrutiny because of its unreliable and invalid nature. *See United States ex rel. Wax v. Pate*, 298 F.Supp. 164 (N.D.Ill.1967), *affirmed* 409 F.2d 498 (7th Cir.), *cert. denied*, 396 U.S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969). *Cf. Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).[14]

This judicial scrutiny reflects skepticism among experts in the field itself. In 1969 Professor Dershowitz reviewed studies on the predictions of anti-social conduct and concluded:

" . . . that psychiatrists are rather inaccurate predictors—inaccurate in an absolute sense and even less accurate when compared with other professionals, such as psychologists, social workers and correctional officials and when compared to actuarial devices, such as prediction or experience tables. Even more significant

for legal purposes, it seems that psychiatrists are particularly prone to one type of error—over prediction. They tend to predict antisocial conduct in many instances where it would not, in fact, occur. Indeed, our research suggests that for every correct psychiatric prediction of violence, there are numerous erroneous predictions. That is, among every group of inmates presently confined on the basis of psychiatric predictions of violence, there are only a few who would, and many more who would not, actually engage in such conduct if released."

Dershowitz, The Psychiatrist's Power in Civil Commitment: A Knife That Cuts Both Ways, *Psychology Today*, Feb. 1969, at 47.

Recent studies support Professor Dershowitz's conclusions: "perhaps the most striking evidence supporting Dershowitz's conclusions comes from the study of the results of "Operation Baxstrom" involving 969 prisoner-patients in New York State who were affected by the Supreme Court's decision in *Baxstrom v. Herold.* [383 U.S. 107, 86 S.Ct. 760 15 L.Ed.2d 620 (1966)]. The Court held that those persons remaining in Department of Corrections Hospitals after their prison terms had expired must be released, and committed civilly, if at all. Each of the 969 patients had been detained in maximum-security hospitals because psy-

**13.** In *United States v. Mattson*, 469 F.2d 1234 (9th Cir. 1972) cert. den'd, 410 U.S. 986, 93 S.Ct. 1513, 36 L.Ed.2d 183 (1973) the court indicated that unless counsel was notified of the dual purpose of the psychiatric exam—determination of both competency and sanity—was ordered the psychiatric evidence would be inadmissible. In *United States v. Alvarez*, 519 F.2d 1036, 1041 (3rd Cir. 1975), the court held that failure in an order, to provide for the dual nature of the examination would render the psychiatric testimony inadmissible. *See also Birdsell v. United States*, 346 F.2d 775 (5th Cir. 1965), cert. denied, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1966) where the court stated:

"Although '[I]t is not to be assumed * * * that a psychiatrist who has been ordered to prepare an opinion as to a man's trial competency will conduct the type of examination which is necessary to provide the trier of the facts with the information essential for a proper determination of criminal responsibili-

ty,' *Winn v. United States* [106 U.S.App.D.C. 133], 270 F.2d 326, 328 (1959), a record may show that this was in fact done, and we think that was the case here." 346 F.2d at 780. *See also United States v. Driscoll*, 399 F.2d 135, 137 (2nd Cir. 1968) ("We do not believe that a defendant can be told that he is to be examined for one purpose and, once his cooperation has been obtained, be advised of another".)

**14.** As the court in *United States ex rel. Wax v. Pate*, 298 F.Supp. 164, 167 (N.D.Ill.1967) noted:

"It is an accepted fact of which the court will take notice that the results of psychiatric observations and examinations are often a good bit more conjectural than the results of scientific laboratory tests on finger prints, blood samples, hair and the like. The variables and technique are many. And indeed, considerable ferment has been engendered as to the sufficiency of the present legal tests of insanity."

chiatrists determined that they were mentally ill and too dangerous for release or even for transfer to civil hospitals. Nevertheless, one year after the patients were transferred to civil hospitals, 147 had been discharged to the community and the 702 who remained were found to present no special problems to the hospital staff. Only seven patients were found to be so difficult to manage or so dangerous as to require recommitment to a Department of Corrections hospital. Several years later, 27% of the patients were living in the community, only nine had been convicted of a crime (only two of felonies), and only 3% were in a correctional facility or hospital for the criminally insane.

"Another recent study, described by one observer as the 'most extensive study to date on the prediction . . . of dangerousness in criminal offenders' confirms the lesson of *Baxstrom*. A team of at least five mental health professionals, including two or more psychiatrists, was asked to conduct unusually thorough clinical examinations of individuals who had been convicted previously of serious assaultive crimes (often sexual in nature), assigned to special treatment programs after conviction, and who were then eligible for release. Based upon the examinations, extensive case histories, and the results of psychological tests, the team attempted to predict which individuals again would commit assaultive crimes if released. These predictions of dangerousness were made prior to the court hearings at which the ultimate release decisions were made. Of 49 patients considered by the evaluating team to be dangerous and therefore not recommended for release, but who nevertheless were released after a court hearing, 65% had not been found to have committed a violent crime within five years of returning to the community. *In other words, ⅔rds of those released despite predictions of dangerousness by the professional team did not in fact turnout to be dan-*

*gerous."* Ennis & Litwack, Psychiatry and the Presumptions of Expertise: Flipping Coins in the Courtroom, 62 Cal.L.Rev. 693, 712–13 (1974) (Footnotes omitted) (emphasis supplied.)

I do not believe that psychiatric testimony should be excluded per se from the guilt/innocence trial and/or circumscribed in the punishment stage as some legal scholars have suggested. *See Bartholomew & Milte,* The Reliability and Validity of Psychiatric Diagnosis in Courts of Law, 50 Austr.L.J. 450 (1976). I hold only that when the state introduces psychiatric testimony on dangerousness at the punishment phase of a capital trial the defense must have a fair opportunity to cross examine that testimony and rebut it with expert testimony on behalf of the defendant. When that fair opportunity is denied the defendant, as it was here, our adversary system breaks down and a man is unjustly sentenced to die.

In the future to insure the right to effective cross examination and the right to effectively defend the case through expert rebuttal testimony, which the due process clause guarantees, defense counsel must be notified that a psychiatric examination will be held on the issue of "dangerousness" the results of which may be used at the penalty phase of the trial. Defense counsel prior to trial, must have meaningful access to the report, now required by state statute, prepared by the psychiatrist stating his findings and conclusions. If the trial court wishes to appoint a psychiatric expert on the issue of dangerousness the order of appointment should so reflect. The testimony of a court appointed psychiatrist and his report would then be equally available to both defense and prosecution for presentation to the jury.[15] However, both sides should have a meaningful right to obtain additional psychiatric experts to either supplement or challenge the conclusions of the court appointed expert.

15. When the psychiatrist is not appointed on the issue of "dangerousness" (but limited to competency, for example) and the prosecutor nevertheless intends to use the psychiatrist at the penalty stage on the issue of dangerousness, notice of this intention must be given to defense counsel. In that event, the jury may not be told that the psychiatrist is court appointed.

■ In summary, the due process clause of the Fourteenth Amendment was violated in this case because (1) Dr. Grigson was informed of his appointment by the prosecutor and not through written order of the court; (2) defense counsel was never notified of the appointment; (3) a psychiatric report was never filed; (4) defense counsel never received a copy of Dr. Grigson's letter summarizing his conclusions, sent to the judge; (5) the state's attorney intentionally omitted Dr. Grigson's name from the witness list in violation of the trial court's order even though the prosecutor knew at least several days before the punishment stage that Dr. Grigson would be called as a witness and that his testimony would not be rebuttal testimony but would be critical to the state's case; (6) the psychiatrist was appointed to determine competency but was permitted to testify on the completely unrelated issue of "dangerousness" and; (7) the trial judge permitted the state's attorney to create the impression with the jury that Dr. Grigson had been appointed by the court for the purpose of determining the defendant's "dangerousness" and that the court was therefore vouching for Dr. Grigson's testimony.[16]

B. The Death Penalty and Mitigating Circumstances: The Eighth Amendment.

In *Jurek v. State of Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) the United States Supreme Court upheld the constitutionality of the Texas Death Penalty Statute.[17] It found that at the sentencing stage the Texas statute assured that all possible relevant information about the individual defendant would be brought before the jury. *Jurek, supra* at 271–76, 96 S.Ct. 2950. The constitutionality of the Texas procedure rests upon the ability of the defendant to present mitigating circumstances.

■ For the same reasons specified in subsection A of this opinion, I find that the defendant was, in effect, denied the opportunity to present mitigating circumstances concerning his supposed personality disorder. The opportunity to effectively challenge Dr. Grigson's conclusion was not available. The opportunity to obtain and present psychiatric testimony on behalf of the defendant was not present. Finally, Dr. Grigson testified that defendant showed no remorse or guilt over the incident. When Mr. Simmons attempted to question Smith about his remorse or guilt the following took place:

Q. By Mr. Simmons: Did you tell Howie to look out when you saw Mr. Moon either reaching for a pistol or whatever else he had?

A. Yes, sir.

Q. Ernest, do you understand and know that it is wrong to do what you did and what you were involved in?

A. Yes, sir.

Q. Do you regret this thing has happened to Mr. Moon? (the murder victim)

A. Mr. Mulder, State's Attorney. We object to that.

The Court: Sustained.

Mr. Simmons: We will pass this witness, your Honor.[18]

16. Under the above described circumstances, I find that Mr. Simmons and Mr. Wilson protected their client's interest to the extent possible. However, if one assumes that there is no error in the manner in which Dr. Grigson's testimony was introduced, that would inevitably lead to the conclusion that Smith was denied the effective assistance of counsel because they failed to produce rebuttal psychiatric testimony and to explore the ramifications of the psychiatric issue. *See United States v. Edwards*, 488 F.2d 1154, 1164–65 (5th Cir. 1974). If I found Mr. Simmons and Mr. Wilson did not provide effective assistance of counsel, which I decline to do, then Smith's death penalty would be rendered constitutionally invalid on that ground.

17. Tex.Penal Code § 19.03 (1974); ·Tex.Code Crim.Pro. Art. 37.071 (Supp.1975–76.)

18. Record at 2743–44. I do not believe that this was necessarily an improper objection or that the trial judge ruled erroneously. It is generally immaterial that a criminal defendant regrets now what he did in the past. At the time this objection was lodged the jury had not yet found Smith guilty. Only Mr. Mulder knew at that point in the trial that Dr. Grigson would put into issue the defendant's lack of remorse

The Texas statute, on its face, provides that all relevant evidence will be presented to the jury but, as applied in this case, the jury was clearly unable to consider all the evidence.[19] Accordingly, the death penalty in this case constitutes cruel and unusual punishment. Here the jury was told all the reasons why the death sentence should be imposed but only some of the reasons why it should not. Cf. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The State was directly responsible for causing the suppression of the additional reasons why the death penalty should not be imposed.

### C. Right to Counsel and Right to Remain Silent.

In addition to challenging the death penalty on due process and Eighth Amendment grounds, petitioner has alleged a violation of right to counsel and the right to remain silent with respect to his compelled psychiatric examination. The state has responded to these challenges on the merits even though neither was a ground for objection at the trial court and neither issue was presented to the Texas Court of Criminal Appeals.[20] It must be determined whether the Texas "True Contemporaneous Objection Rule" bars considerations of these two claims in this federal habeas corpus proceeding. See Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Jiminez v. Estelle, 557 F.2d 506 (5th Cir. 1977); Patterson v. State of Texas, 509 S.W.2d 857 (Tex.Crim.App.1974). A federal district court may consider a claim in a habeas corpus petition that was not presented to the state courts, if it deter-

mines the petitioner has shown "cause" for failing to object in state court with resulting "prejudice" to the defendant. To fully develop the record, I have asked Mr. Simmons to file an affidavit explaining the reason (cause) why he did not raise these objections before either Judge Scales or the Texas Court of Criminal Appeals.

Before considering whether the showing of "cause" and "prejudice" is adequate under Sykes, the court must determine whether in a federal habeas corpus proceeding the state may waive the "contemporaneous objection" defense. In both Sykes and Jiminez, the state sought to uphold the convictions on the basis of the contemporaneous objection rule. See Sykes, at 433 U.S. 84, at 97 S.Ct. 2505–06, at 53 L.Ed.2d 607; Jiminez at 557 F.2d 507. Here, however, the state has joined issue on the alleged right to counsel. Likewise, the state has responded on the merits to the contention that the accused has a right to remain silent at the psychiatric exam and must be advised of that right.

It is certainly beyond question that procedural rights may be waived. There is nothing about the state's relinquishment of this procedural advantage that affects this court's jurisdiction or eliminates the existence of a live case or controversy. Accordingly, I hold that the "contemporaneous objection" defense may be waived and is so waived when the state decides to answer on the merits without relying either solely or in the alternative on the contemporaneous objection rule.

Even though this rule is designed to produce criminal proceedings which are as free of error as possible, the state is to be com-

---

or guilt. With this knowledge the objection was perhaps improper as the jury could have been instructed not to consider the testimony on the issue of guilt but only on punishment if they returned a guilty verdict. The better procedure, however, would be to recall the defendant at the punishment phase and ask him the material questions then. Mr. Simmons, for some reason, did not do that in this case.

**19.** See Richmond v. Arizona, — U.S. —, 98 S.Ct. 8, 54 L.Ed.2d 34 (1977) (Rehnquist, J.) where defendant's sociopathic personality was presented as a mitigating factor at the punish-

ment phase. While a sociopathic personality might in some cases be used in mitigation it was not done so in this case. The state clearly argued that this sociopathic personality disorder made the defendant "dangerous" thus requiring an affirmative answer to question 2.

**20.** These matters were apparently first raised in the petitioner's writ of habeas corpus before Judge Scales and subsequently, the Texas Court of Criminal Appeals. Both writs were denied without a hearing.

mended for not raising this procedural bar here where a constitutional issue of first impression is presented to a federal court. Although the interest in minimizing error in criminal proceedings is a weighty concern, the state also has a strong interest in determining as soon as practicable whether its procedures implementing a recently enacted statute comply with the United States Constitution.

The Texas Death Penalty Statute was revised in light of *Furman v. Georgia, supra,* and only recently upheld by the United States Supreme Court. The practice of introducing psychiatric testimony at the punishment stage of a capital case is, therefore, in its infancy. If the right to counsel and/or right to remain silent apply in a psychiatric examination, it is better for the state—in terms of minimizing error in criminal trials—to have that determination made now rather than later.

As I have found the contemporaneous objection rule inapplicable in this case, it is unnecessary to determine whether Mr. Simmons' "cause" for failing to object is adequate under *Sykes.* If I am wrong in this determination, however, the record has been made for the appellate courts, in the case of appeal, to make that determination. As outlined in Subsection A of this opinion, I believe the requirement of prejudice has clearly been met.

### 1. The Right to Counsel.

The Texas Court of Criminal Appeals held in *Livingston v. State of Texas,*[21] that the use of testimony obtained from a compelled psychiatric examination in a capital murder sentencing hearing does not violate the Sixth Amendment right to counsel. The Court relied on prior holdings which found no right to counsel at a psychiatric examination on competency or sanity. Although some courts require the presence of

counsel[22] at a competency or sanity examination the majority view is to the contrary.[23] The 5th Circuit Court of Appeals squarely subscribes to the majority view that there is no right to counsel in a compelled psychiatric examination to determine competency or sanity. *United States v. Cohen,* 530 F.2d 43, 47–48 (5th Cir. 1976); *cert. denied* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Smith,* 436 F.2d 787, 790 (5th Cir. 1971), *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

The question then boils down to whether a distinction may be made between psychiatric examinations for determinations of competency or sanity and psychiatric examinations for "dangerousness". One reason for denying the right to counsel is common to all three—the presence of counsel would destroy the purpose of the examination. See *Thornton v. Corcoran,* 132 U.S.App.D.C. 232, 248, 407 F.2d 695, 711 (1969) (Burger, J., Dissenting). I agree with the comment of the now chief justice that:

> "Our approach should encourage an attitude of cooperation rather than partisanship; emphasis must be on the common pursuit for an objective, uninhibited inquiry, uncluttered by the techniques and devices of the courtroom." 132 U.S.App. D.C. 248, 407 F.2d 711.

Any right to counsel in this area would therefore have to consider the practical limitations of the psychiatric examination. In *United States v. Wade*[24] the Supreme Court held there was a right to be represented by counsel at a police lineup. The *Wade* court proposed two tests for determining whether the presence of counsel is necessary: (1) potential substantial prejudice to defendant's rights which inheres in a particular confrontation and (2) the ability of counsel to help avoid that prejudice.

**21.** 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

**22.** *See e. g. Lee v. County Court of Erie County,* 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971).

**23.** *See e. g. United States v. Albright,* 388 F.2d 719 (4th Cir. 1968).

**24.** 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

*See United States v. Baird,* 414 F.2d 700, 711 (2nd Cir. 1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970).

If the state follows the procedures outlined in Part A of this opinion, which I have found compelled by the due process clause, the potential for substantial prejudice is minimized.[25] If one accepts that counsel may not participate in the examination, as one must if its purpose is to be preserved then the lawyer's ability to avoid any residual prejudice is minimal. I therefore hold that the right to presence of counsel is not required in a compelled psychiatric examination for the purpose of determining "dangerousness", even though I believe the examination is a critical stage of the criminal proceedings. The Sixth Amendment is not so inflexible as to require the presence of counsel when that presence would destroy the character of the proceeding, especially in light of minimal prejudice to the defendant.

The Sixth Amendment, however, also requires the effective assistance of counsel. To insure this right the procedural safeguards required in Subsection A of this opinion are compelled by the Sixth Amendment as well as the due process clause of the Fourteenth. As they were unavailable to petitioner here his sentence is invalid under the Sixth Amendment.

As Chief Justice Burger observed in *Thornton,* the check on the processes by which the psychiatrist reaches his conclusion is the power to cross-examine him. Because the psychiatric examination demands privacy, the presence of counsel is not required so long as the power of effective cross-examination and the right to gather additional expert psychiatric testimony is not impaired. 132 U.S.App.D.C. at 248, 407 F.2d at 711. That right was clearly impaired here.

2. The Right to Remain Silent.

Petitioner claims his right to remain silent under the Fifth Amendment was vio-lated when he was examined by Dr. Grigson without notice to his counsel and without being advised that he had a right to remain silent. The State contends that there is no constitutional right involved because communications at the psychiatric examination are non-testimonial. One commentator has written that this is the "best" reason for holding that the Fifth Amendment privilege against self incrimination does not apply to a compelled psychiatric examination on the issue of dangerousness. *See* Crump, Capital Murder: The Issues in Texas, 14 Hou.L.Rev. 531, 574–75 (1977).

The Texas Court of Criminal Appeals has refused to apply the Fifth Amendment privilege to a compelled psychiatric examination on dangerousness. The court found that the communications involved in such an examination were not testimonial. *See Livingston v. State of Texas,* 542 S.W.2d 655 (Tex.Cr.App.) *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

A federal court is not, of course, bound by a state court's determination of federal law. I believe, therefore, an independent look at this problem is required. The so-called "testimonial" limitation on the privilege against self incrimination is rooted in Mr. Justice Holmes' opinion in *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). In *Holt* the Defendant was compelled to try on a blouse to show that it fit him. Mr. Justice Holmes stated that: "[T]he prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to exhort communications from him, not an exclusion of his body as evidence when it may be material." 218 U.S. at 252–53, 31 S.Ct. at 6. In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the Supreme Court followed the Holmes reasoning in holding that the privilege against self incrimination was not violated by the taking of a blood sample over the objection of a criminal defendant. It was held that the resulting blood sample

---

25. The actual statements of the accused to the psychiatrist are inadmissible at the guilt and possibly the punishment phases of the trial. *See Livingston v. State, supra,* at 661–62.

"was neither petitioner's testimony nor evidence relating to some communicative act . . . ." 384 U.S. at 765, 86 S.Ct. at 1833.

In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) the Supreme Court found no Fifth Amendment violation where the Defendant was compelled to speak within hearing distance of witnesses to the alleged crime. The court found this "no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse." 388 U.S. at 222, 87 S.Ct. at 1930. In *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) the court held that requiring a Defendant to provide a handwriting exemplar would not violate the privilege. The Court stated that "[a] mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the privilege's] protection." 388 U.S. at 266–267, 87 S.Ct. at 1953.

Finally, in *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) the court refused to apply the privilege to compelled voice exemplars which were obtained for comparison with tape recordings of alleged criminal activity. The Court wrote: "*Wade* and *Gilbert* definitely refute any contention that the compelled production of the voice exemplars in this case would violate the Fifth Amendment. The voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said." 410 U.S. at 7, 93 S.Ct. at 768. (footnote omitted).

All of these cases reach only those situations where identifiable physical characteristics or properties of the Defendant are compelled. *See People v. Evans*, 90 Misc.2d 195, 393 N.Y.S.2d 674 (1977).[26] It does not matter what the Defendant speaks or what he writes when a voice or handwriting exemplar is produced. The Defendant is only being compelled to divulge the way he speaks or the manner in which he writes both of which are non-testimonial acts to which the privilege does not apply.

The compelled psychiatric examination on the issue of "dangerousness" clearly rests on different ground. Here it is not only the *way* the Defendant communicates to the psychiatrist, but also the content of *what* he says that forms the basis of the expert opinion.[27]

I, therefore, do not believe that the *Holt* line of cases inevitably leads to the conclusion urged by the State. Each of these cases has been careful to distinguish between the "content" of the communication and the "fact" of the communication. No such distinction is possible where the psychiatrist, as here, relies, at least in part, on the *content* of the communication elicited from the Defendant.[28]

It might be argued that while the Supreme Court has not extended the *Holt* doctrine to compelled psychiatric examinations, many decisions of the circuits have done so with respect to the issues of competency and sanity. However, the issues of competency and sanity are distinguishable from an examination for dangerousness. When the issue of sanity is raised by the

---

**26.** It strikes the court that an issue of reliability is also raised even if one assumes that the communications in a psychiatric examination are non-testimonial. This involves the requirement that the physical characteristics or properties be identifiable. No two lab technicians would disagree over the results of a blood sample or a fingerprint. Handwriting exemplars and voice exemplars may also be analyzed with some precision. A diagnosis of a person's present and past mental condition is less reliable but nevertheless much more accurate than a prediction of future behavior which inheres in a diagnosis of "dangerousness".

**27.** For example:

Psychiatrist: Do you feel remorse over the victim's death?
Defendant: No I do not.
Psychiatrist: Do you feel guilt over the victim's death?
Defendant: No I do not.
Psychiatrist Conclusion: The defendant shows no remorse or guilt over the victim's death and, principally for this very important reason, I believe he is a severe sociopath.

**28.** Dr. Grigson clearly relied at least in part on Smith's oral communication that he felt no remorse or guilt over the incident.

Defendant, some courts have held that the psychiatric examination may be compelled by either the state or the court as the privilege against self incrimination has either been waived or the Defendant is estopped from asserting it. *See e. g., Lee v. County Court of Erie County,* 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971). When the sanity defense is raised the Government must prove that the Defendant was not insane at the time the crime was committed and often the only way it may meet this burden is through expert psychiatric testimony.[29] Sanity is therefore an issue raised by the defendant where the only evidence to rebut the defense is in the possession of the defendant. Dangerousness, by contrast, is an issue raised by the prosecution where psychiatric testimony is only one of a number of ways the issue may be proved to the jury.

The issue of competency raises somewhat different problems. First, if raised by the Defendant the same principles of waiver and estoppel might apply. Second, and more importantly, psychiatric testimony on competency can rarely be used against the criminal Defendant. In many states the issue must be determined prior to the trial on the merits.[30] Third, the state and the Defendant do not have truly adverse interests in a competency evaluation. Both seek to have only mentally competent Defendants stand trial.

The benign effect of psychiatric testimony on the issue of competency differs sharply from the psychiatric testimony of "dangerousness". Dr. Grigson's testimony was clearly used against Smith at the punishment stage. The State, at least at one point in this litigation,[31] took the position that the only evidence in support of the jury's answer to question number two was the Grigson testimony. This testimony would have been gutted—if not rendered completely worthless, without the cooperation of Smith. That cooperation took the form of a 90 minute interview where the contents of his communications to Dr. Grigson were used against him by the State at the punishment stage of the trial.[32]

It is clear, however, that the psychiatric knife can cut both ways. Psychiatric testimony could be as beneficial to some criminal Defendants at the punishment stage as it was damaging to Smith. It may be difficult to determine prior to an examination what conclusions will result, although certain psychiatrists may gain a reputation for seeing problems in a particular way.

If the Defendant initiates a psychiatric examination on the issue of dangerousness or if he seeks to introduce psychiatric testimony at the punishment phase he can not hide behind his privilege against self incrimination when the court or the prosecutor seek to have him examined by an additional psychiatrist, or when the prosecutor attempts to introduce the testimony by the Defendant's expert, or its own expert at the punishment phase. In such cases the Defendant would waive his privilege against self incrimination, and also any doctor-patient privilege.

If, however, the Defendant does not request a psychiatric examination on the issue of "dangerousness" and does not seek to introduce testimony on this issue, he may

29. *See, e. g., United States v. Cohen, supra.* Here, however, there are a number of other ways for the state to show "dangerousness". Thus, the jury could consider the defendant's prior criminal record, if any; the range and severity of his prior criminal conduct; his age; whether he was acting under duress or under the domination of another; and efforts to rehabilitate himself after a criminal conviction. *See Jurek v. State of Texas,* 428 U.S. at 272–73, 96 S.Ct. 2950.

30. *See, e. g.,* Tex.Code Crim.Pro. Art. 46.02 § 2 (Supp.1976–77).

31. In its brief submitted to the Texas Court of Criminal Appeals the state relied solely upon Dr. Grigson's testimony to support the jury finding on question 2. The Court of Criminal Appeals seemed to rely in addition on the facts of the primary offense, a five year probated sentence for possession of marijuana and a poor employment record.

32. It would be constitutionally permissible for a psychiatrist to merely observe the defendant for the purposes of diagnosis. But whether mere observations would be legally sufficient to form the basis for a medical opinion on dangerousness need not be decided here.

not be compelled to participate in a psychiatric examination to determine dangerousness.

▬ A difficult problem of waiver is presented when the Defendant raises the insanity defense but is nevertheless found guilty. At the punishment stage may the jury consider the psychiatric evidence on sanity as a mitigating factor and, if so, may the state then introduce psychiatric testimony on dangerousness? Ordinarily the jury would be permitted to consider the Defendant's psychiatric evidence on sanity as a mitigating factor. If the Defendant intends to rely on this testimony at the punishment stage, he then waives his privilege against self incrimination and the State may have a psychiatrist examine the Defendant on the issue of dangerousness and introduce testimony on this issue before the jury.

If, however, the Defendant does not wish to rely on his psychiatrist's insanity testimony at the penalty stage then the jury must be instructed to disregard the psychiatric testimony as a mitigating factor and the privilege against self incrimination may be asserted to foreclose either a compelled psychiatric examination on the issue of dangerousness or evidence from a court appointed or state psychiatrist on dangerousness learned from a sanity or competency examination.

▬ In the future if the State or Court seeks to have the Defendant examined by the psychiatric expert on the issue of dangerousness, the Defendant must be advised he has a right to remain silent. If the Defendant indicates that he wishes to exercise that right, he may not be questioned by the psychiatrist for the purpose of determining dangerousness.

Smith was not so advised in this case and his sentence of death is thus in violation of the Fifth Amendment of the United States Constitution.

(D) Conclusion.

The Petitioner has alleged several additional constitutional violations [33] but as I have found no such violation with respect to the guilt or innocence phase and as I have granted the relief requested with respect to the punishment phase it is unnecessary to reach these additional issues.

In summary, it is this Court's opinion that:

(1) The circumstances surrounding the state's presentation of Dr. Grigson's testimony at the punishment stage of the trial were grossly unfair and the Defendant was thus denied due process of law;

(2) The Defendant was effectively denied the right to present complete testimony regarding mitigating factors on his alleged personality disorder which supposedly makes him a continuing threat to society;

(3) The Defendant was denied the right to effective assistance of counsel because of the methods employed by the state with respect to the Grigson testimony; there is, however, no right to the presence of counsel at a psychiatric examination on dangerousness;

(4) The Defendant was not advised of his right to remain silent at the psychiatric examination on dangerousness where he did not seek to introduce psychiatric testimony on the issue himself at the punishment stage or at the guilt/innocence stage and where he did not initiate a psychiatric examination on the issue.

---

**33.** The petitioner raises an interesting point concerning the severity of the death penalty for a defendant who does not actually pull the trigger. This is the so-called non-triggerman issue which is currently before the United States Supreme Court. *Bell v. Ohio*, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977).

It strikes this court that there may be instances where the non-triggerman is just as culpable as the triggerman. I believe this case is one of them although the fact that this defendant did not actually commit the murder certainly is a mitigating factor for the jury's consideration. At any rate, I believe it would be unwise to adopt a *per se* rule for non-triggermen. One can envision a situation where one person, shouldering and aiming a bazooka for his trigger pulling accomplice is as culpable as his cohort.

Whatever the merits or demerits of this controversy, it should be resolved soon by the Supreme Court and, in light of the present posture of this case, it is unnecessary to decide that question here.

Some may be shocked that a convicted murderer has for the moment escaped death through what may seem to them a legal technicality. But whereas "technicalities" are often thought of as mindless and silly elevations of form over substance the procedures denied to the Defendant in this case are basic and fundamental. They may be summed up in one word—fairness. And one need not condone the acts of this Defendant to agree that he is entitled to a fair proceeding and that he is entitled to the same opportunity to put on his evidence as is given the State.

Our legal procedures—as opposed to superfluous "technicalities"—separate our judicial system from virtually all others in the history of the world. They separate us from those systems where rights are guaranteed on paper but denied in practice. They separate us from those systems where the guilt of the Defendant is never to be doubted. They separate a free country from a controlled one.

The money and effort the State of Texas will be forced to spend retrying the penalty phase of this Defendant's trial is the price our continued freedom and independence demand.